OAKES, Chief Judge:
This appeal requires us to decide whether the Eleventh Amendment bars a debt- or’s suit to recover taxes paid to the State of New York, and whether 11 U.S.C. § 1146(c) (1988) exempts the debtor from payment of the New York gains tax on the transfer of property, N.Y.Tax Law § 1441 (McKinney 1987). The United States Bankruptcy Court for the Southern District of New York, Tina L. Brozman, Bankruptcy Court Judge, found that the New York State Department of Taxation and Finance, James W. Wetzler, as New York Commissioner of Taxation and Finance, and Ed *506 ward V. Regan, as Comptroller of the State of New York (collectively “State of New York,” “New York,” or “appellant”) waived the State of New York’s immunity from suit by filing a proof of claim in the bankruptcy proceeding, found that the debtor was exempt from the gains tax, and accordingly ordered New York to refund the gains tax paid by the debtor, 995 Fifth Avenue Associates, L.P. (“Fifth Avenue”). New York appealed to the United States District Court for the Southern District of New York. Leonard B. Sand, District Judge, affirmed the opinion and order of the bankruptcy court and the State of New York now appeals.
For the reasons set forth below, we affirm in part and reverse in part.
BACKGROUND
The relevant facts are not in dispute. The debtor, Fifth Avenue, operated the Stanhope Hotel. It filed a bankruptcy petition under Chapter 11 of the Bankruptcy Code in February of 1988 and thereafter continued to operate the hotel as debtor in possession. Pursuant to a plan of reorganization, the bankruptcy court authorized the sale of Fifth Avenue’s interest in the hotel at a price of $76 million. The court’s order specifically declared that, because the sale was part of a plan of reorganization, § 1146(c) rendered the sale exempt from all transfer taxes.
On January 12, 1989, the day before the scheduled closing, in accordance with N.Y.Tax Law § 1447 (McKinney 1987), New York issued a Tentative Assessment and Return imposing a gains tax of $2,608,-603.80 on the sale of the property. New York subsequently denied the debtor’s request for an exemption from the tax under 11 U.S.C. § 1146(c). Because New York law prohibits recordation of the deed without payment of tax due under a Tentative Assessment and Return, Fifth Avenue could not close the sale as scheduled without paying the gains tax. Faced with this dilemma, the debtor paid the tax under protest, enabling it to record the deed and close the sale.
In March 1989, the debtor brought an adversary proceeding in bankruptcy court against the State of New York, seeking, inter alia, a declaration that § 1146(c) exempted the debtor from the gains tax, and an order directing that the payment made to New York be refunded. Some months later, after the bankruptcy court heard oral argument in the proceeding, the State of New York filed an administrative expense claim for gains tax liability of $2,137,-496.76, an amount in addition to the approximately $2.6 million already imposed by the state and paid by the debtor.
The bankruptcy court found that the debtor’s sale was exempt from the gains tax under § 1146(c). In response to the State of New York’s Eleventh Amendment immunity argument, the bankruptcy court held that pursuant to 11 U.S.C. § 106(a) (1988), New York had waived its Eleventh Amendment immunity by filing the administrative expense claim for additional gains tax. The district court affirmed the decision and order of the bankruptcy court.
DISCUSSION
I. Eleventh Amendment Immunity
Appellant argues that the Eleventh Amendment barred both the bankruptcy court and the district court from considering whether the debtor was exempt from payment of the New York gains tax. The Eleventh Amendment, where applicable, deprives a federal court of jurisdiction. See Edelman v. Jordan, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974). Thus, prior to addressing the merits of this case we must first determine whether Eleventh Amendment immunity bars our jurisdiction. We hold that it does not.
The Eleventh Amendment provides:
The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
The reach of the amendment was judicially expanded beyond its text in Hans v. Loui *507 siana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), to bar citizens from suing their own states in federal court. The Supreme Court has also consistently held that federal suits by private citizens that seek damages to be paid out of the state treasury are barred by the Eleventh Amendment. See, e.g., Quern v. Jordan, 440 U.S. 332, 337, 99 S.Ct. 1139, 1143, 59 L.Ed.2d 358 (1979).
Despite this general bar to suits against states created by the Eleventh Amendment, there are two well-established ways to provide judicial power over such cases: abrogation of immunity by Congress and waiver of immunity by a state. Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984). A purported Congressional abrogation of Eleventh Amendment immunity is not effective, however, unless it meets a two-part test set forth by the Court. First, Congress must make its intent to abrogate Eleventh Amendment immunity “unmistakably clear.” Pennsylvania v. Union Gas Co., 491 U.S. 1, 7, 109 S.Ct. 2273, 2277, 105 L.Ed.2d 1 (1989) (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985)). Second, the constitutional provision under which Congress legislates its purported abrogation must grant Congress the power to override the Eleventh Amendment. Union Gas, 491 U.S. at 13-23, 109 S.Ct. at 2280-86. Abrogation of Eleventh Amendment immunity typically occurs when Congress enacts a new federal statutory cause of action. See, e.g., Fitzpatrick v. Bitzer, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976) (Eleventh Amendment immunity abrogated for suit to recover damages from the State for gender-based employment discrimination under Title VII); Union Gas Co., 491 U.S. at 23, 109 S.Ct. at 2286 (Eleventh Amendment immunity abrogated for suit to recover costs from the State for environmental clean-up under CERCLA).
Waiver of Eleventh Amendment immunity, in contrast to abrogation, is not hinged to a specific federal statutory cause of action. Instead, it is triggered by some affirmative activity of a state, such as a state’s enactment of legislation by which it consents to be sued in federal court, see, e.g., Port Auth. Trans-Hudson Corp. v. Feeney, 495 U.S. 299, 307-09, 110 S.Ct. 1868, 1873-75, 109 L.Ed.2d 264 (1990), and, as here, a state’s participation in litigation in federal court. In Clark v. Barnard, 108 U.S. 436, 447-48, 2 S.Ct. 878, 882-84, 27 L.Ed. 780 (1883), for example, the State of Rhode Island was deemed to have waived its Eleventh Amendment immunity by intervening in a case as a claimant of a fund. And the Court in Gardner v. New Jersey, 329 U.S. 565, 574, 67 S.Ct. 467, 472, 91 L.Ed. 504 (1947), held that where the State of New Jersey filed a claim against a fund in bankruptcy court, in a case where no judgment was sought against the State, the State waived its immunity. Thus, as the district court noted, it is long-established that a state’s participation in a bankruptcy proceeding can trigger a waiver of immunity.
The State of New York does not take issue with this general principle. Rather, it argues that the provision of the Bankruptcy Code under which the bankruptcy court deemed the State to have waived its Eleventh Amendment immunity — 11 U.S.C. § 106(a) — represents an abrogation provision, not a waiver scheme. As an abrogation provision, New York contends, § 106(a) is unconstitutional because Congress lacks the authority to abrogate sovereign immunity when enacting legislation under the Bankruptcy Clause, U.S. Const, art. I, § 8, cl. 4. We disagree with New York’s characterization of § 106(a).
Section 106(a) provides:
A governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit’s claim arose.
The plain meaning of these words obviously reflects Congress’s intent to provide a waiver of immunity where “a governmental unit” files a claim in the bankruptcy court. The scope of the waiver, of course, *508 remains limited; upon filing a claim the governmental unit subjects itself only to claims that arose from the same transaction or occurrence that formed the basis of the governmental unit’s claim. Our conclusion derives further support from two recent cases where the Supreme Court, albeit in dicta, stated that § 106(a) provides for a limited waiver of immunity. See Hoffman v. Connecticut Income Maint. Dept., 492 U.S. 96, 101-02, 109 S.Ct. 2818, 2822-23, 106 L.Ed.2d 76 (1989); U.S. v. Nordic Village, Inc., — U.S. -, -, 112 S.Ct. 1011, 1013-14, 117 L.Ed.2d 181 (1992).
In addition, Congress did not use the language of abrogation in § 106(a). Compare, for example, the language used by Congress in Union Gas, where the Court held that Congress abrogated Eleventh Amendment immunity in making states liable for cleanup costs under CERCLA. Union Gas, 491 U.S. at 13, 109 S.Ct. at 2280-81. In the provisions there at issue, Congress stated that any “person,” “owner[,] and operator” shall be liable. 42 U.S.C. § 9607(a) (1988). Congress went on to include states in the definition of a “person,” 42 U.S.C. § 9601(21), and except in very limited situations Congress provided that states fall within the meaning of the term “owner or operator.” See 42 U.S.C. § 9601(20)(D). Thus, CERCLA contains the language of abrogation by clearly stating that states can be liable for cleanup costs. Section 106(a) contains no similar statement regarding the liability of states for a specific class of damages.
Not only is the wording of § 106(a) different from language aimed at a general override of immunity, but this provision provides for suits against states by a route that differs markedly from the typical abrogation context. Typically, abrogation occurs when Congress has enacted a cause of action generally and seeks to render states, in particular, liable for damages “along with everyone else.” Union Gas, 491 U.S. at 8, 109 S.Ct. at 2278. Section 106(a), however, renders a state liable to suit only when the state participates in a bankruptcy proceeding by filing a claim.
Thus, § 106(a) creates a waiver scheme; it is not an abrogation provision. Indeed, the section largely partakes of the waiver by participation doctrine that received the Supreme Court’s imprimatur in Gardner, 329 U.S. at 574, 67 S.Ct. at 472. Because we find that § 106(a) specifies when a state has waived its Eleventh Amendment immunity, we need not address appellant’s contention that Congress lacks the authority to abrogate sovereign immunity when enacting legislation under the Bankruptcy Clause, U.S. Const. art. I, § 8, cl. 4.
Next, we consider the validity of the purported waiver of Eleventh Amendment immunity under § 106(a). We note at the outset that, like the First Circuit, we see no constitutional barrier to a waiver of Eleventh Amendment immunity as provided in § 106(a). In WJM, Inc. v. Massachusetts Dept. of Public Welfare, 840 F.2d 996, 1002-005 (1st Cir.1988), the Court held that Congress possesses the authority to condition a state’s participation in a bankruptcy proceeding on its waiver of Eleventh Amendment immunity. The Court in WJM relied in part on Atascadero, where the Court considered whether states can be sued for damages under a Congressionally-created cause of action. In Atascadero, the Court determined that the Congressional legislation in question fell “far short of manifesting a clear intent to condition participation in the programs funded under the Act on a State’s consent to waive its constitutional immunity.” Atascadero, 473 U.S. at 247, 105 S.Ct. at 3149-50. After citing this language, the WJM court reasoned:
The logical inference from this and other language in Atascadero, however, is that Congress may effectively condition a state’s participation in a federal program on a state’s consent to federal jurisdiction, so long as Congress manifests a clear intent to this effect.
WJM, 840 F.2d at 1003. We agree with the First Circuit’s analysis.
Our conclusion regarding Congressional authority, however, does not end the inquiry, because we will only give effect to Congressional legislation that purports to condition state participation in litigation on *509 a state’s waiver of Eleventh Amendment immunity when Congress “manifest[s] a clear intent” to do so. Atascadero, 473 U.S. at 247, 105 S.Ct. at 3149-50. This requirement is analogous to the test the Court applies to determine the validity of a state’s waiver of Eleventh Amendment immunity by state legislation. In that context, “[t]he Court will give effect to a State’s waiver of Eleventh Amendment immunity ‘only where stated by the most express language or by such overwhelming implication from the text as [will] leave no room for any other reasonable construction.’ ” Feeney, 495 U.S. at 299, 110 S.Ct. at 1868 (quoting Atascadero, 473 U.S. at 239-40, 105 S.Ct. at 3146 and Edelman, 415 U.S. at 673, 94 S.Ct. at 1360-61). We discern no substantive difference between the test for a Congressional waiver scheme, as set forth in Atascadero, and the test for a waiver by state legislation, as applied in Feeney. Thus, we must again turn to the language of § 106(a) to determine whether it plainly requires a waiver of Eleventh Amendment immunity and “leave[s] no room for any other reasonable construction.” Atascadero, 473 U.S. at 240, 105 S.Ct. at 3146.
Appellant argues that no such waiver of Eleventh Amendment immunity is implicated by § 106(a) because, by its terms, it fails to mention the Eleventh Amendment. Explicit mention of the Eleventh Amendment, however, has never been a requirement for waiver of immunity. For example, in Feeney, the Court found that by statute the states of New York and New Jersey had waived their Eleventh Amendment immunity, but nowhere did the statutory provisions mention the Eleventh Amendment. Feeney, 495 U.S. at 303, 306-09, 110 S.Ct. at 1871-72, 1873-74. See also Dellmuth v. Muth, 491 U.S. 223, 233, 109 S.Ct. 2397, 2403, 105 L.Ed.2d 181 (1989) (Scalia, J, concurring) (statutory text may override Eleventh Amendment immunity without explicit reference to either state sovereign immunity or the Eleventh Amendment). Similarly, the text’s failure specifically to mention states is irrelevant: § 106(a) uses the term “governmental unit,” which the Bankruptcy Code defines in 11 U.S.C. § 101(26) (1988) as including a “State.” To hold otherwise would ignore the fact that Congress routinely expresses its intent with statutes drafted with definitional cross-references.[1] Accordingly, we find that § 106(a) plainly expresses Congress’s intent to provide for a limited waiver of Eleventh Amendment immunity and “leave[s] no room for any other reasonable construction.” Atascadero, 473 U.S. at 240, 105 S.Ct. at 3146.
Applying § 106(a) to the facts of this case, we find that the State of New York, by filing an administrative expense claim for $2,137,496.76, waived its Eleventh Amendment immunity with respect to the $2,608,603.80 in gains tax paid by the debt- or. As we have stated, § 106(a) provides for waiver of Eleventh Amendment immunity from any claim against the state “that arose out of the same transaction or occurrence out of which such governmental unit's claim arose.” Here, the State’s administrative expense claim arose from additional gains tax levied on the sale of the Stanhope Hotel. Fifth Avenue’s claim against the State for a refund also arose from gains tax imposed on the sale of the Stanhope Hotel. Thus, appellee’s claim for a tax refund arose from the same transaction or occurrence — the sale of the Stan-hope Hotel — as the State’s claim for additional taxes. Accordingly, the Eleventh Amendment does not bar us from reaching the merits of this case.
II. Whether the Gains Tax is a “Stamp Tax or Similar Tax”
We now consider whether the New York gains tax, N.Y.Tax Law § 1441 (McKinney 1987), is a “stamp tax or similar tax” within the meaning of 11 U.S.C. § 1146(c). Because the New York gains tax is not a “stamp tax or similar tax,” we hold that 995 Fifth Avenue is not entitled to an exemption from the gains tax.
*510 A.
We begin our discussion with an analysis of the type of taxes from which Congress intended to exempt qualifying debtors when it enacted 11 U.S.C. § 1146(c). Starting with the text, section 1146(c) provides:
The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp tax or similar tax.
The Bankruptcy Code supplies no definitions for the terms “stamp tax” or “similar tax.” Thus, we must look to the legislative history for assistance in determining what Congress meant by the phrase “stamp tax or similar tax.” This history, however, provides limited guidance.
Section 1146(c), enacted as part of Title 11 and the general revision of the federal bankruptcy laws in 1978, was derived from § 267 of the Bankruptcy Act of 1898, as amended by the Chandler Act of 1938, ch. 575, § 267, 52 Stat. 840, 902-03 (1938) (repealed in 1979). In essence, the new provision broadened the scope of the exemption to include taxes “similar” to stamp taxes: whereas § 267 exempted the debtor from “any stamp taxes now or hereafter imposed,” § 1146(c) provides exemption from “any law imposing a stamp tax or similar tax” (emphasis added).[2] The legislative history surrounding the enactment of § 1146(c) does not illuminate what Congress meant when it added the words “or similar tax.”
Similarly, there is no relevant legislative history to shed light on Congressional intent behind the enactment of the earlier exemption provision, § 267, which was part of the Chandler Act of 1938. Section 267 greatly changed the wording of its precursor provision, § 77B(f) of the Bankruptcy Act, as amended by the Act of June 7, 1934, ch. 424, § 77B(f), 48 Stat. 911, 919 (1934) (amended in 1938). Section 267 used general language to expand an exemption that had shielded qualified debtors from federal stamp taxes only into one that shielded such debtors from state stamp taxes as well. See 11 Harold Remington, A Treatise on the Bankruptcy Law of the United States § 4654 (Kenneth A. Hayes, ed., rev. 1961).
Section 77B(f), the original source of the stamp tax exemption, was added to the Bankruptcy Act by the Act of June 7, 1934, and represented Congress’s first effort to provide for the reorganization of corporations in bankruptcy. 1 Harold Remington & James A. Henderson, A Treatise on the Bankruptcy Law of the United States § 10 (5th ed. 1950). By its terms, § 77B(f) provided debtors with exemptions from only specific federal stamp taxes on the issuance and transfer of stock and bonds and on conveyances of realty. One of the purposes of § 77B(f) was to exempt the debtor from the payment of federal stamp tax on new securities issued pursuant to a plan of reorganization that required the debtor to modify the terms of outstanding securities for which stamp tax had already been paid.[3] See S.Rep. No. 482, 73rd Cong., 2d Sess. 4 (1934). In sum, although the legislative history shows that the scope of the § 1146(c) tax exemption has expanded since its original enactment in 1934, it fails to indicate whether the New York gains tax qualifies as a “stamp tax or similar tax.”
Absent more explicit guidance from either the text or the legislative history, we must interpret the words used by Congress in accordance with “their ordinary, contemporary, common meaning.” Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). Dictionaries represent one source of such *511 common meaning. See, e.g., United States v. Adames, 901 F.2d 11, 12 (2d Cir.1990). Black’s Law Dictionary 1259 (5th ed. 1979) defines “stamp tax” as the “cost of stamps which are required to be affixed to legal documents such as deeds, certificates, and the like.” The definition also contains a cross-reference to “[documentary stamp,” which Black’s defines as “[s]tamp required by federal (prior to 1968) and state law to be affixed to deeds and other documents of transfer before they may be recorded, the cost of which is generally governed by the consideration recited in the document.” This definition indicates that there are at least two attributes to a stamp tax, as that term is commonly understood: the tax must be paid prior to recordation and the amount due is generally governed by the consideration provided in the instrument.
The common meaning of the term “stamp tax” can also be ascertained by examining the attributes of typical stamp taxes. We therefore agree with the district court insofar as it identified several of the essential attributes of a stamp tax, in reliance on Lee v. Bickell, 292 U.S. 415, 417, 54 S.Ct. 727, 728, 78 L.Ed. 4337 (1934) and Texaco, Inc. v. United States, 624 F.2d 20, 21-22 (5th Cir.1980). According to the district court, all stamp taxes (1) are imposed only at the time of transfer or sale of the item at issue; (2) impose an amount due that is determined by the consideration recited in the instrument of transfer; and (3) must be paid as a prerequisite to recording.
Based on the characteristics of several taxes that would undoubtedly be considered a “stamp tax or similar tax” within the meaning of § 1146(c), we believe there are several additional essential elements of all such taxes. One such element is that the tax rate, imposed by a stamp or similar tax, is a relatively small percentage of the consideration for the underlying transfer. We first consider the stamp taxes discussed in the federal cases relied upon by the district court. The Florida documentary stamp tax at issue in Lee v. Bickell, 292 U.S. 415, 54 S.Ct. 727, 78 L.Ed. 1337 (1934), imposed a tax on the sale and transfer of securities of 10 cents on each $100.00 of par or face value. See Lee at 418 n. *, 54 S.Ct. at 729 n. *. Effectively, this Florida tax imposed a tax rate of Vio of one percent of par or face value. In Texaco, Inc. v. United States, 624 F.2d 20, 21 (5th Cir.1980), the documentary stamp tax that the taxpayers sought to avoid, section 4361 of the Internal Revenue Code of 1954, ch. 736, § 4361, 68A Stat. 3, 520 (1954) (repealed in 1968) imposed a tax on the sale or transfer of realty of approximately 55 cents per $500 of consideration or value of the property interest. The resultant tax rate was slightly more than Vio of one percent of the consideration or value.[4]
Like the low rates imposed by these two stamp taxes, several modern state documentary transfer taxes, which we regard as similar to stamp taxes, also impose low tax rates. Vermont has a property transfer tax, Vt.Stat.Ann. tit. 32, § 9602 (1981), imposed on the transfer of real property by deed, at a rate of 6/io of one percent of the value of the property. The tax is imposed when the deed is delivered to the town clerk for recording, Vt.Stat.Ann. tit. 32, § 9605 (1981), and compliance with the provisions of the property transfer tax is a prerequisite to recording. Vt.Stat.Ann. tit. 32, § 9608 (Supp.1991). Connecticut terms its property transfer tax the Real Estate Conveyance Tax. Conn.Gen.Stat.Ann. § 12-494 (West Supp.1991). The tax rate ranges from 55/ioo of one percent up to 1 percent of the consideration depending on whether the property is residential and whether its value exceeds $800,000. Id. The transferor is liable for the tax, Conn. Gen.Stat.Ann. § 12-495 (West 1983), and deeds subject to the tax can not be recorded unless the tax is paid. Conn.Gen.Stat. Ann. § 12-497 (West Supp.1991). New York has a similar tax, the Real Estate Transfer Tax, N.Y.Tax Law § 1402 & 1402-a (McKinney Supp.1992). It imposes *512 a tax on deeds of $2 for every $500 of consideration or value, yielding a tax rate of 4/io of one percent. N.Y.Tax Law § 1402 (McKinney Supp.1992). Like the other documentary transfer taxes, the transfer tax must be paid prior to recordation. N.Y.Tax Law § 1410(b) (McKinney Supp.1992). The grantor is liable for payment of the tax, but if he fails to pay it the grantee becomes liable. N.Y.Tax Law § 1404(a) (McKinney Supp.1992). The New York scheme also imposes an additional tax on the conveyance of residential property when the consideration is $1 million or more at one percent of the consideration; the grantee is generally liable for this additional tax. N.Y.Tax Law § 1402-a (McKinney Supp. 1992). The foregoing examples of stamp and documentary transfer taxes show that an essential characteristic of these taxes is that they are calculated using a low tax rate — typically about one percent or less— multiplied by either the par value of the security, the consideration in the deed, or the value of the property that is the subject of the transaction.[5]
Finally, we add one more essential characteristic of stamp taxes to those identified by the district court. As stated in In re Jacoby-Bender, Inc., 40 B.R. 10, 15 (Bankr.E.D.N.Y.1984), where the bankruptcy court held that the New York gains tax is not a stamp or similar tax within the meaning of 11 U.S.C. 1146(c), stamp taxes are imposed irrespective of whether the transfer resulted in a gain or loss to the transferor. All of the stamp taxes and real estate transfer taxes discussed above never even touch on whether the underlying transaction resulted in a gain or loss to the transferor.
In sum, we believe that all stamp or similar taxes as stated in 11 U.S.C. § 1146(c) share the following common elements: (1) they are imposed only at the time of transfer or sale of the item at issue; (2) the amount due is determined by the consideration for, par value of, or value of the item being transferred; (3) the tax rate is a relatively small percentage of the consideration, par value or value of the property; (4) the tax is imposed irrespective of whether the transferor enjoyed a gain or suffered a loss on the underlying sale or transfer; and (5) in the case of state documentary transfer taxes, the tax must be paid as a prerequisite to recording. We next turn to the New York gains tax to determine whether it shares those attributes common to all stamp or similar taxes.
B.
Section 1441, contained in Article 31-B of New York Tax Law provides:
A tax is hereby imposed on gains derived from the transfer of real property within the state. The tax shall be at the rate of ten percent of the gain.
N.Y.Tax Law § 1441 (McKinney 1987). Gain is defined for the purposes of Article 31-B as:
the difference between the consideration for the transfer of real property and the original purchase price of such property, where the consideration exceeds the original purchase price.
N.Y.Tax Law § 1440.3 (McKinney 1987). Under the version of the statute in force at the time of the sale of the Stanhope Hotel, the transferor was required to pay the tax on the date of transfer.[6] N.Y.Tax Law § 1442 (McKinney 1987). Transactions that are exempt from the tax include those for which the consideration is less than one million dollars and those in which the real property that is the subject of the transfer is the residence of the transferor. N.Y.Tax Law § 1443 (McKinney 1987 & Supp.1992). Under N.Y.Tax Law § 1447.1(f)(1) (McKinney 1987), recording is prohibited unless the ministerial requirements of the act have been complied with and any tax due has been paid. See also N.Y.Real Property Law § 333.1-f (McKinney 1987) (prohibit *513 ing recording officer from recording unless the provisions of § 1447.1(f) are satisfied).
Our analysis of the essential characteristics of stamp or similar taxes indicates that although the New York gains tax bears some resemblance to a stamp tax, it is not a stamp or similar tax within the meaning of 11 U.S.C. § 1146(a). As Fifth Avenue correctly points out, like a stamp tax, the gains tax is imposed at the time of transfer and payment, if due, must be made prior to recordation. But there the resemblance ends.
First, and most important, New York gains tax liability is always contingent on the profitability of the underlying transaction. If the transaction yields no gain, there is no tax due. The fact that “gain,” as calculated under the gains tax, does not take into account certain development costs in no way alters this core attribute of the gains tax. Stamp taxes and documentary transfer taxes, by contrast, are always imposed irrespective of the existence of gain or profit; the tax liability arises solely from the act of transferring property or securities.
Second, under the gains tax, the consideration for the sale (or some proxy thereof as set forth in N.Y.Tax Law § 1440 (McKinney 1987 & Supp.1992)) is not determinative of the amount due under the gains tax. Instead, the consideration is used only as a means to measure the gain accruing to the transferor as a result of the transfer. It is the gain, albeit as defined by the provisions of the gains tax, that provides the key figure for determination of the amount owed under the tax. The amount due under a stamp or similar tax hinges on the consideration for the transferred item.
Third, the tax rate provided in the New York gains tax, at 10 percent of the gain, •greatly exceeds the tax rate used in any stamp tax or documentary transfer tax. Stamp and documentary transfer taxes impose a low tax rate, typically about one percent or less of the consideration for the underlying transfer. These three important differences between the New York gains tax and stamp and documentary transfer taxes lead us to conclude that the New York gains tax is not a “stamp tax or similar tax” within the meaning of 11 U.S.C. § 1146(c).
Finally, we note that Fifth Avenue provides several rationales in support of its contention that the gains tax cannot be characterized as an income tax. For example, Fifth Avenue reasons that the gains tax is not a form of income tax because it does not allow a taxpayer to offset losses against gains in calculating net income generated by transactions completed over a specific period of time. This contention, however, misses the point: the relevant issue is not whether the gains tax can be pigeonholed as an income tax, but whether it represents a stamp or similar tax within the meaning of § 1146(c). For the reasons set forth above, we believe it does not and thus Fifth Avenue is not entitled to an exemption from the New York gains tax. Thus, we reverse the order of the district court insofar as it directed New York to refund gains tax paid by Fifth Avenue.
Affirmed in part and reversed in part.

. The State of New York also argues that § 106(a) is insufficiently clear because it does not mention the filing of a proof of claim. We do not believe this fact renders Congress’s intent unclear, because the only reasonable construction of § 106(a) is that waiver will arise only if a claim is actually filed.

. The report of the House Judiciary Committee stated that "[sjection 1146(c) of title 11 broadens the exemption to any stamp or similar tax." H.R.Rep. No. 595, 95th Cong., 1st Sess. 281 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6238. We disagree with the district court to the extent it concluded that this statement reflects Congress’s intent that the words "stamp or similar tax” be read broadly to accord greater tax relief for debtors. Instead, we regard this statement as a simple declaration that the new provision, § 1146(c), enlarges the former exemption under § 267 to include taxes similar to stamp taxes.

. These stamp taxes were repealed by the Excise Tax Reduction Act of 1965, Pub.L. No. 89-44, § 401(b), 79 Stat. 148 (1965), effective January 1, 1968.

. Note that this tax provision, § 4361, contains a cross-reference to section 4382 of the Internal Revenue Code of 1954. Section 4382, an exemption provision, refers to the Bankruptcy Act, largely tracks the language of § 267, and exempts debtors from this stamp tax on transactions undertaken pursuant to a plan of reorganization. Thus, the stamp tax imposed by § 4361 certainly was a stamp tax from which Congress intended qualified debtors to be exempt.

. We note that this analysis is consistent with our decision in In re Jacoby-Bender, Inc., 758 F.2d 840 (2d Cir.1985), in which we found that 11 U.S.C. § 1146(c) (1982) exempted the debtor from payment of the New York City Real Property Transfer Tax, New York, N.Y.Admin.Code § II46-2.0 (1984); at that time the New York City tax imposed a maximum tax rate of two percent.

. The specifics regarding payment of and liability for the tax have since been somewhat modified. See N.Y.Tax Law §§ 1440.9, 1442(a) & 1447.3(a) (McKinney 1987 & Supp.1992).