Theodore F. WICHMANN,
Plaintiff–Appellee,

v.

BOARD OF TRUSTEES OF SOUTH-
ERN ILLINOIS UNIVERSITY,
Defendant–Appellant.

No. 97–2902.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 11, 1998.

Decided June 7, 1999*.

* Judge Cummings participated in the consider-
ation of this case but died before the decision was rendered.

Gene Gross (argued), Reed, Heller, Mansfield & Gross, DuQuoin IL, for Plaintiff–Appellee.

Carla J. Rozycki (argued), Julia H. Perkins, Jenner & Block, Chicago, IL, Shari R. Rhode, Carbondale, IL, for Defendant–Appellant.

Seth M. Galanter, Department of Justice, Civil Rights Division, Appellate Section, Washington, DC, for Intervenor.

Before CUMMINGS, FLAUM and ROVNER, Circuit Judges.

PER CURIAM.

In August 1994, Theodore Wichmann, then 48 years old, was fired from his job at Southern Illinois University (the "University"), a state institution of higher education. Wichmann had been employed by the University for about 20 years and had been promoted to Associate Director of the University's Touch of Nature Environmental Center (the "Center") in 1985. His primary duties were the management of "experiential educational" programs, which involved taking various sorts of groups ranging from troubled youth to corporate executives to secluded areas for up to a month at a time. Wichmann would then conduct exercises meant to promote particular educational goals. Wichmann was apparently very good at his job. Every evaluation of his performance was glowingly positive. Two younger experiential educators whom he had mentored resigned at least partly because of his dismissal.

In the spring or summer of 1994, Wichmann's supervisor, Dr. Phillip Lindberg, decided to reduce the staff. Lindberg obtained the University President's approval for this decision. Lindberg fired Wichmann and Karen Hand, then age 35, Wichmann's subordinate in one of the programs for which Wichmann was responsible, the Wilderness Program, on August 15, 1994. He notified them that they each would be given a 12–month terminal contract and transferred to another University department. A terminal contract gives a dismissed employee a nonrenewable job for a specified period, here, one year. Such terminal contracts are common in academia, where hiring operates on an annual cycle rather than continuously. Lindberg is no longer with the University.

The University avers that Lindberg's sole reason for the firing was to resolve a budget deficit in the Wilderness Program. Wichmann's age was not a motivating factor in the decision, according to the University, as shown by the decision to fire the then 35–year–old Hand. Wichmann argues that he was fired solely because of his age and that the University's cost-cutting rationale was a pretext. The Center's accountant, Allen Bratten, testified that the accounting at the Center was unreliable. Apparent surpluses in Wichmann's programs, Bratten said, would be made to disappear by changing the accounting methods so that surplus funds would not have to be repaid to another state agency. Wichmann argued, accordingly, that the Center's books were manipulated to provide a pretext for his termination. Lindberg himself admitted that accounting documents at the Center were sometimes misleading. Bratten bolstered Wichmann's pretext argument by testifying that Wichmann's termination in fact jeopardized the financial situation of the Center.

After the terminations, Lindberg approved a restructuring plan for the Wilderness Program. A meeting was held on September 13, 1994 to explain the restructuring to the staff. When Lindberg was asked at that meeting by Susan Campagno, a Center employee, why he had chosen to fire Wichmann, Lindberg replied: "Susan, think of it like this. In a forest you have to cut down the old, big trees so the little trees underneath can grow." This statement is undisputed, as is the fact that Lindberg knew that it was illegal to fire someone because of age. Lindberg admitted that the "little trees" were younger employees.

Several of these younger employees who had helped develop the restructuring plan benefitted from its implementation. Will Marble, then age 30, was given a pro-

motion, a raise, and some of Wichmann's former duties; Tim Humes, then age 28, was promoted twice, once immediately after the firings; Joe Moore, then also under 40, was also given a promotion and raise. Some employees 40 or over were also given some of Wichmann's management responsibilities. The University says Wichmann's and Hand's positions were simply eliminated as part of the restructuring plan, their duties being in part assumed by other employees, some younger and some older than Wichmann, or in any case that the positions remained unfilled. Wichmann argues that the restructuring involved in effect filling the position by redistributing its main duties to younger employees. Accountant Bratten testified that job descriptions at the Center were meaningless and had been manipulated for various purposes and that no positions had been eliminated in connection with Wichmann's discharge.

Wichmann had little chance of obtaining comparable work as an experiential educator, a rare speciality, in or near Southern Illinois or indeed elsewhere. While working in his terminal job, Wichmann pursued reinstatement. There was some dispute about whether he investigated a position in his new unit. Wichmann also testified that, while still at the University, he applied for 42 job positions and received no interviews. The University asserts that he applied for only two positions. This apparent factual discrepancy arises because the University's position is that the trial court improperly relied, in calculating damages, upon oral evidence of Wichmann's job search after it excluded written evidence as a discovery sanction. Wichmann is now self-employed on a winery he owns in Southern Illinois.

Wichmann sued the University in May 1995 under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq.[1] The trial was bifurcated. In the liability phase, a jury found that the University had willfully violated the ADEA, firing Wichmann because of his age, though knowing that firing him for that reason was illegal. The remedy was tried by consent of the parties before Magistrate Judge Philip Frazier, exercising jurisdiction under 28 U.S.C. § 636(c)(1) and pursuant to Fed.R.Civ.P. 73. Wichmann was awarded back pay, liquidated damages, costs, and attorney's fees, and the University was ordered to reinstate him in his former job. The University appeals on the grounds that (1) Wichmann's lawsuit is barred by the Eleventh Amendment; (2) the evidence was legally insufficient to support the jury verdict; (3) the trial court improperly refused a proposed "business judgment" instruction to the jury; (4) Wichmann failed to mitigate his damages; and (5) it was an abuse of discretion to award Wichmann liquidated damages, which the University characterizes as "front pay." We affirm.

## I. THE ELEVENTH AMENDMENT AND THE ADEA

The Eleventh Amendment denies a federal court jurisdiction in any suit "against one of the United States by Citizens of another State." U.S. Const., amend. XI. It has been construed to bar suits against a state by its own citizens without its consent or unless the immunity has been waived. *See Hans v. Louisiana*, 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The University, a state institution, here has not consented to be sued nor waived its immunity. However, Congress may abrogate a state's immunity if it has (1) " 'unequivocally expresse[d] its intent to abrogate ...' " and (2) "acted 'pursuant to a valid exercise of power.' " *Seminole Tribe of Florida v. Florida*, 517 U.S. 44,

---

1. The statute in pertinent part makes it "unlawful for an employer ... to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The protected class is employees 40 years of age and over. *Id.* § 631.

55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) (internal citations omitted). The University argues that in enacting the ADEA, Congress either did not in fact abrogate the states' sovereign immunity or lacked the constitutional power to do so under the Fourteenth Amendment. This Court has rejected these arguments previously, *see Goshtasby v. Bd. of Trustees of the Univ. of Ill.*, 141 F.3d 761, 766, 772 (7th Cir. 1998); *Davidson v. Bd. of Govs. of State Colleges & Univers.*, 920 F.2d 441, 443 (7th Cir.1990); *EEOC v. Elrod*, 674 F.2d 601, 606 (7th Cir.1982), as have all but two Circuits that have considered the matter.[2] The University asks us to reconsider in view of *Humenansky v. Regents of the Univ. of Minnesota*, 152 F.3d 822 (8th Cir.1998), and *Kimel v. Florida Bd. of Regents*, 139 F.3d 1426 (11th Cir.1998), *cert. granted*, —— U.S. ——, 119 S.Ct. 901, 142 L.Ed.2d 901 (1999). We reaffirm our previous view.

■ Wichmann's contention that the University has waived the Eleventh Amendment argument because it was not raised below in a timely way is without merit. State sovereign immunity " 'sufficiently partakes of the nature of a jurisdictional bar' that it may be raised by the State for the first time on appeal." *Patsy v. Bd. of Regents of Florida*, 457 U.S. 496, 516 n. 19, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) (internal citations omitted).

■ Congressional intent to abrogate Eleventh Amendment immunity must be "unmistakably clear in the language of the statute." *Dellmuth v. Muth*, 491 U.S. 223, 228, 109 S.Ct. 2397, 105 L.Ed.2d 181 (1989); *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); *Seminole Tribe*, 517 U.S. at 55, 116 S.Ct. 1114. As originally enacted in 1967, the ADEA did not men-

tion the States or their subdivisions. In 1974 the statute was amended to expand the definition of "employer" to expressly include "a State or political subdivision of a state or any instrumentality of a State." Fair Labor Standards Act ("FLSA") Amendments of 1974, Pub.L. 93–259, Sec. 28, 88 Stat. 74 (amending 29 U.S.C. § 630(b)(2)). We have said that "[u]nless Congress had said in so many words that it was abrogating the states' sovereign immunity in age discrimination cases—and that degree of explicitness is not required ...—it could not have made its desire to override the states' sovereign immunity clearer." *Davidson*, 920 F.2d at 443. The Supreme Court itself has repeatedly acknowledged that "there is no doubt what the intent of Congress was: to extend the application of the ADEA to the States." *EEOC v. Wyoming*, 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) (dictum), *accord Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 118 S.Ct. 1952, 1954, 141 L.Ed.2d 215 (1998) ("[T]he ADEA plainly covered state employees ....") (dictum).

■ The language we consider here is unmistakably clear because the amendment makes "a State" an employer and the statute prohibits employers from engaging in age discrimination. *See* 29 U.S.C. § 623(a)(1). It follows as a matter of elementary logic that states are therefore prohibited from engaging in age discrimination. While a merely "permissible inference" of intent to abrogate is insufficient, *Dellmuth*, 491 U.S. at 232, 109 S.Ct. 2397, the inference here is required because its denial would lead to a contradiction. The Supreme Court so reasoned in holding that the Americans with Disabilities Act clearly applied to inmates of state prisons, noting

**2.** *Accord Ramirez v. Puerto Rico Fire Serv.*, 715 F.2d 694, 700–701 (1st Cir.1983); *Santiago v. New York State Dep't of Correctional Servs.*, 945 F.2d 25, 31 (2d Cir.1991) (dictum); *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 695 (3d Cir.1996); *Arritt v. Grisell*, 567 F.2d 1267, 1271 n. 11 (4th Cir.1977); *Scott v.*

*Univ. of Mississippi*, 148 F.3d 493, 500 (5th Cir.1998); *Coger v. Bd. of Regents of Tennessee*, 154 F.3d 296, 307 (6th Cir.1998); *Keeton v. Univ. of Nevada System*, 150 F.3d 1055, 1057 (9th Cir.1998); *Hurd v. Pittsburg State Univ.*, 109 F.3d 1540, 1544 (10th Cir.1997).

that, since the statute covers "'public entities,'" State prisons "fall squarely within the statutory definition of 'public entity,' which includes 'any ... instrumentality of a State....'" *Yeskey,* 118 S.Ct. at 1954–1955 (internal citations omitted) (a statutory interpretation case).

The Eleventh Circuit panel says that the Supreme Court rejected precisely this argument from logic stated above when it held that a 1966 amendment of the FLSA to include certain state agencies in the statutory definition of "employer" and allowing suits in courts of "competent jurisdiction" "did not provide the clear statement of intent to abrogate immunity." *Kimel,* 139 F.3d at 1431–1432 (*citing Employees of the Dep't of Public Health & Welfare v. Missouri,* 411 U.S. 279, 281, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973)). But *Employees* addresses the standard of clear intent for Congressional abrogation of state sovereign immunity under the Commerce Clause, *Employees,* 411 U.S. at 284–285, 93 S.Ct. 1614, now a moot issue, *see Seminole Tribe,* 517 U.S. at 72, 116 S.Ct. 1114 (no abrogation under Commerce Power). While Congress did enact the ADEA under the Commerce Power, *see Wyoming,* 460 U.S. at 243, 103 S.Ct. 1054, the present case concerns whether Congress also acted under the Fourteenth Amendment. The standards for a clear statement of intent to abrogate under the Fourteenth Amendment are not the same as those formerly required under the Commerce Clause. The *Employees* Court thought that unmistakably clear language in the statute was insufficient and that support from legislative history was also necessary. *See Employees,* 411 U.S. at 285, 93 S.Ct. 1614 (There was "not a word in the history of the 1966 [FLSA] amendments to indicate a purpose of Congress [to abrogate state sovereign immunity].").

That is no longer good law. *See Dellmuth,* 491 U.S. 223, 230, 109 S.Ct. 2397, 105 L.Ed.2d 181 (disapproving of the use of legislative history in this context).[3]

■ The Eighth Circuit majority in *Humenansky* argues that Congress, when responding to *Employees,* changed the enforcement provision of the FLSA to permit actions "against any employer (including a public agency) in any Federal or State court," Pub.L. 93–259, Sec. 6, 88 Stat. 61 (codified at 29 U.S.C. § 216(b)), but did not similarly amend the enforcement provisions of the ADEA, which still only permitted enforcement "in any court of competent jurisdiction." 29 U.S.C. § 626(c)(1), although it amended the ADEA's definition of "employer" to include the states. The Eighth Circuit majority concludes that the ADEA therefore offers no "proper basis for finding 'unmistakably clear' intent...." *Humenansky,* 152 F.3d at 825. But "[t]he search for significance in the silence of Congress is too often the pursuit of a mirage." *Scripps–Howard Radio, Inc. v. FCC,* 316 U.S. 4, 11, 62 S.Ct. 875, 86 L.Ed. 1229 (1942); *see also United States v. Wells,* 519 U.S. 482, 496, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997) (Congressional silence "at best [a] treacherous" basis for imputation of legislative intent). We hold again that Congress unequivocally expressed its intent to abrogate.

We now turn to whether Congress acted pursuant to a valid exercise of power. Since the Supreme Court has ruled that Congress could not abrogate the Eleventh Amendment under the Commerce Clause, *Seminole Tribe,* 517 U.S. at 63, 72, 116 S.Ct. 1114, the remaining issue is whether the ADEA represents a valid exercise of Congress' power under § 5 to enforce the provisions of the Fourteenth Amendment. We have held that it is because Equal

---

**3.** The ADEA would satisfy the Commerce Power standard if it applied because we have both unmistakably clear language and support in the legislative history. The 1974 amendment was intended to "remove discriminatory barriers against employment of older workers ... at the Federal and local government levels as it has ... in private employment." S.Rep. No. 93–690, 93d Cong., 2d Sess., 55 (1974); H.R.Rep. No. 93–913, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 2811, 2850.

Protection has long been held to require all state classification of persons to have at least a rational basis, treating similarly all similarly situated individuals. *See Goshtasby,* 141 F.3d at 771 *(citing City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). Equal Protection is not limited to a closed short list of privileged classifications and the Supreme Court has subjected age classifications to rational basis review. *See Mass. Bd. of Retirement v. Murgia,* 427 U.S. 307, 314, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976); *Gregory v. Ashcroft,* 501 U.S. 452, 470, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991). The classifications considered there were held to meet that standard, but there would have been no point in applying the standard if it made no difference whether the laws satisfied it. The ADEA amendment does not advert to § 5, but " 'the constitutionality of action taken by Congress does not depend on recitals of the power which it undertakes to exercise.' " *Goshtasby,* 141 F.3d at 768 *(quoting Woods v. Miller Co.,* 333 U.S. 138, 144, 68 S.Ct. 421, 92 L.Ed. 596 (1948), and citing other cases).

The University's only argument here which deserves a second look is based on the theory that in applying the ADEA to the states, Congress went beyond its "remedial and preventative" power to enforce the Fourteenth Amendment, *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 2166, 138 L.Ed.2d 624 (1997) (invalidating Religious Freedom Restoration Act ("RFRA")), and attempted to exercise a "substantive, non-remedial" power it lacks. *Id.* at 2167. RFRA prohibited the states from enacting even generally applicable laws that substantially burdened the free exercise of religion unless these laws satisfied the most rigorous sort of judicial scrutiny. On this theory, the ADEA amendment, like RFRA, fails the requirements of "congruence and proportionality between the injury to be prevented and the means adopted ...," *id.* at 2164, which is necessary for remedial action.

■■ We have said that proportionality is a matter of the " 'extent of the threatened constitutional violations and the scope of the steps provided in the legislation to remedy or prevent such violations.' " *Goshtasby,* 141 F.3d at 771 *(citing Coolbaugh v. Louisiana,* 136 F.3d 430, 435 (5th Cir.1998)). The proportionality test requires that the more intrusive upon state powers and prerogatives is the Congressional enactment, and the more universal or general the enactment is in its intrusiveness, the greater is the burden upon Congress to articulate, through findings or otherwise, the extent of the evils the statute is meant to remedy and prevent. An enactment which is less intrusive into state powers or less universal in scope, like the Voting Rights Act of 1965, *see City of Boerne,* 117 S.Ct. at 2169–2170, will require less by way of findings which reveal such violations than one which, like RFRA, is more intrusive and universal in scope. City of Boerne, however, does not require that Congress supply appropriate findings whenever it seeks to act under § 5. *See id.* at 2170 ("Judicial deference, in most cases, is based not on the state of the legislative record, but 'on due regard for the decision of the body constitutionally appointed to decide.' ").

The first part of our inquiry concerns intrusiveness. If the Voting Rights Act and RFRA are at the extremes on the continuum of intrusiveness considered here, the ADEA is in the middle. Regulation of the terms and conditions of public employment may be an important power or prerogative of the states, but it is not more important than regulation of voting and elections. Like the Voting Rights Act, the scope of which is confined to state voting laws, and unlike RFRA, which "displac[ed] laws and prohibit[ed] official actions of almost every description and regardless of subject matter," *City of Boerne,* 117 S.Ct. at 2170, the ADEA is limited to a "discrete class" of state laws and actions, *id., viz.,* those concerning age criteria for public employment. The

ADEA, unlike RFRA, is prohibitory, imposing no affirmative obligations on the states. The burden the ADEA places upon them, unlike RFRA or the Voting Rights Act, does not require "searching judicial scrutiny," *id.* at 2171, but is more like a rationality test in forbidding discrimination on the arbitrary grounds of age. Like RFRA and unlike the Voting Rights Act, the temporal and spatial reach of the ADEA is unbounded, but "§ 5 legislation [does not] require[ ] termination dates, geographic restrictions, or egregious predicates." *Id.* at 2170. The ADEA, then, is not particularly intrusive.

The second part of the inquiry concerns proportionality of the response to the evils to be remedied. With RFRA, the "legislative record lack[ed] examples of any [modern] instances of . . . laws passed because of religious bigotry." *City of Boerne,* 117 S.Ct. at 2169. The situation was otherwise with the Voting Rights Act. With the ADEA, Congress embodied factual findings in the statute, saying, among other things, that "older workers find themselves disadvantaged in their efforts to retain employment" because "the setting of arbitrary age limits regardless of the potential for job performance has become a common practice...." 29 U.S.C. § 621(a) (quoted in *Goshtasby,* 141 F.3d at 771) (also discussing legislative history); *see also Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610–611, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993); *Wyoming,* 460 U.S. at 230–232, 103 S.Ct. 1054 (acknowledging these findings). The constitutional basis of the Act as applied to the states is, as explained *supra* p. 799, the right under Equal Protection not to be subject to arbitrary state classification without any rational basis. It is fairly determinable that Congress has properly concluded that application of the ADEA to public employment is necessary to remedy or deter constitutional violations of an extent great enough to make this legislative response proportional and congruent in view of its relative lack of intrusiveness. We therefore reaffirm our prior holdings that Congress clearly abrogated the states' sovereign immunity under a valid exercise of its § 5 enforcement powers.

## II. SUFFICIENCY OF THE EVIDENCE

### A. Standards

The University argues that Wichmann failed to carry his burden of proof of age discrimination, so that the district court erred in denying the University's motion for judgment as a matter of law, a determination we review de novo. *Tincher v. Wal–Mart Stores, Inc.,* 118 F.3d 1125, 1129 (7th Cir.1997). We view the evidence in the light most favorable to the nonmoving party and ascertain whether there exists any evidence upon which a jury could reach that verdict. *Deimer v. Cincinnati Sub–Zero Prods., Inc.,* 58 F.3d 341, 343–344 (7th Cir.1995) (internal citations omitted). A mere scintilla is not enough. *La Montagne v. American Convenience Prods., Inc.,* 750 F.2d 1405, 1410 (7th Cir.1984). However, we will overturn a jury verdict for the plaintiff only if we conclude that "no rational jury could have found for the plaintiff." *Collins v. Kibort,* 143 F.3d 331, 335 (7th Cir.1998) (internal citations omitted). We apply this standard "stringently" in discrimination cases, where witness credibility is often crucial. *Williams v. Pharmacia, Inc.,* 137 F.3d 944, 948 (7th Cir.1998). Once the plaintiff prevails before the jury, the method of proof at trial is irrelevant. We simply ask whether the jury's verdict for Wichmann could be sustained on the whole record. *Willis v. Marion County Auditor's Office,* 118 F.3d 542, 545 (7th Cir.1997); *Collins,* 143 F.3d at 335 (citing cases). Here, it can be sustained.

### B. Direct Evidence

The most striking piece of evidence in the case is Lindberg's remark to one of Wichmann's subordinates at the Center during a meeting held within a month of the firings. In direct response to an inquiry as to why Wichmann had been

fired, Lindberg stated, "Think of it like this. In a forest you have to cut down the old, big trees so the little trees underneath can grow." We have held that "an employer statement that reveals hostility to older workers" may constitute direct evidence of discrimination, but have noted that such remarks are "rarely found." *Castleman v. Acme Boot Co.*, 959 F.2d 1417, 1420 (7th Cir.1992). This case presents such a remark, *but see Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 511 (4th Cir.1994) (In overturning a jury verdict, the court held that statement: "There comes a time when we all have to make way for younger people," did not create an inference of age discrimination because it was a truism with no disparaging overtones.). Whether or not we would go as far as the Fourth Circuit, we think that a rational jury might have accepted the University's innocuous explanation, that the "old trees" remark was made to reassure the troubled employees about the reorganization. But a rational jury could also infer illegal motivation from Lindberg's statement in the context in which it was made.

■ Lindberg did not expressly say, "Wichmann was fired because he was too old," but a rational jury could have understood his statement to mean just that. The fact that the "old trees" remark was metaphorical does not make it too ambiguous to qualify as direct evidence. Language may be all the more unmistakable and vivid for being metaphorical, figurative, or nonliteral. *See Federal Election Comm'n v. Christian Action Network, Inc.*, 110 F.3d 1049, 1064 (4th Cir.1997) (acknowledging that "[m]etaphorical and figurative speech can be more pointed and compelling," than "banal, literal language [which] often carries less force.") (election law case); *American Jewish Congress v. City of Chicago*, 827 F.2d 120, 128 (7th Cir.1987) (Establishment Clause context); cf. also *Cohen v. California*, 403 U.S. 15, 26, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (noting emotive significance of nonliteral

expression). Not just any metaphorical language will be direct evidence of discrimination. Whether it is in a particular case will typically be a question of fact.

■ Direct evidence is "evidence which *can be interpreted* as an acknowledgment of the defendant's discriminatory intent. . . . ," *Kormoczy v. HUD*, 53 F.3d 821, 824 (7th Cir.1995) (emphasis added); that is, to constitute direct evidence of discrimination, "a statement must relate to the motivation of the decisionmaker responsible for the contested decision." *Rothman v. Emory Univ.*, 123 F.3d 446, 451 (7th Cir.1997) (internal citations omitted). As an age-related explanation of the firing, Lindberg's statement about cutting down the old trees could certainly be interpreted as a "remark[ or] other evidence that reflect[s] a propensity by the decisionmaker to evaluate employees based on illegal criteria" which, we have said, "'will suffice as direct evidence of discrimination even if the evidence stops short of a virtual admission of illegality.'" *Miller v. Borden, Inc.*, 168 F.3d 308, 312 (7th Cir.1999) (*quoting Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir.1997)). *See also Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1044–45 (7th Cir.1999) ("It would cripple enforcement of the employment discrimination laws to insist that direct evidence take the form of an employer's statement to the effect that 'I'm firing you because you're in a protected group.'").

■ The fact that Lindberg's "old trees" remark is a single "isolated comment" does not disqualify it as direct evidence of discrimination. For "isolated comments" to rise to the level of such evidence, they "must be contemporaneous with the discharge or causally related to the discharge decision making process." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 723 (7th Cir.1998) (internal citations omitted). In that case, a comment disapproving of mothers working made in a casual setting five months before the firing and unrelated to discussions of the inadequate job performance

which led to plaintiff's dismissal was not direct evidence of pregnancy discrimination. *Id.* at 724. But Lindberg's "old trees" remark was made within a month of the firing, in a context where the firing was being discussed, and was offered as an explanation of that action. It was therefore both contemporaneous and causally related. Before "seemingly stray workplace remarks will qualify as direct evidence of discrimination, the plaintiff must show that the remarks 'were related to the employment decision in question.'" *Fuka v. Thomson Consumer Electronics,* 82 F.3d 1397, 1403 (7th Cir.1996) (internal citations omitted) (*citing Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 277, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion and opinion of O'Connor, J., concurring)). Even if Lindberg's was a "stray remark," Wichmann has shown that it was closely enough related to the decision to fire him.

█ The University makes a great deal of the fact that Wichmann's subordinate Hand, then age 35, was also fired. The "old trees," says the University, were Wichmann *and* Hand, who was not in the 40–and–over age group protected by the ADEA. The University asks us to hold that no rational jury could have concluded that Wichmann, who was protected, was fired because of illegal motivations because Hand, who was not protected, was also fired. The jury, however, might rationally have rejected this non sequitur. Wichmann and Hand might *both* have been fired because of age, although only Wichmann would have a cause of action under the ADEA. An employer cannot avoid liability for firing someone 40 or over because of age by also firing someone under 40 because of age. Under these circumstances, that raises no inference of a legitimate nondiscriminatory motive.

## C. Circumstantial Evidence

█ Wichmann also introduced circumstantial evidence that he was fired because of age which tended to support that con-clusion if viewed with the totality of evidence. Younger workers were "treated more favorably than" Wichmann, which is the appropriate standard whether we regard Wichmann's termination as a Reduction in Force, *see Collier v. Budd Co.,* 66 F.3d 886, 891 (7th Cir.1995), or as a case "where one employee is discharged and his responsibilities are absorbed by other employees, which essentially makes the single discharge a mini-RIF." *Gadsby v. Norwalk Furniture Corp.,* 71 F.3d 1324, 1332 (7th Cir.1995). The younger employees were retained, absorbed Wichmann's day-to-day duties, and received pay increases.

█ Taken by themselves, these facts would constitute only a thin case for intentional discrimination, particularly since Wichmann made little showing that the younger employees were similarly situated. *See Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 736 (7th Cir.1994). Thus, while some inference of discrimination may flow from the retention and promotion of younger employees alone, in a single discharge case or mini-RIF, "where fungibility among jobs is not demonstrated, ... the inference of discrimination is necessarily much weaker." *Gadsby,* 71 F.3d at 1331–1332. Nonetheless, these facts do provide some support for such an inference.

We have said that even a thin case may stand on our deferential review of a jury's verdict, *see Price v. Marshall Erdman & Assoc.,* 966 F.2d 320, 322 (7th Cir.1992), but the circumstantial evidence does not stand alone. It looks decidedly stronger in view of Lindberg's explanation of Wichmann's termination ("In a forest you have to cut down the old, big trees so the little trees underneath can grow."). A rational jury might have accepted an innocent explanation of these facts, but it might also have concluded that they showed that Lindberg's remark meant that Lindberg indeed fired Wichmann because of his age.

## D. Rejection of the Defendant's Reasons

 The University attempted to explain its decision on other grounds, but the jury rejected the University's gloss on the evidence. The factfinder's rejection of the defendant's nondiscriminatory explanation of the facts comprising a prima facie case may itself be enough to find for the plaintiff on the issue of liability. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Here, construing the evidence in the light most favorable to Wichmann, as we must, *see Deimer,* 58 F.3d at 343, we conclude that a rational jury might well have found the University's story incredible. A rational jury might indeed have accepted the University's version, but it was not irrational of this jury to reject it, and that by itself could justify the verdict for Wichmann.

According to the University's story, the Wilderness Program Wichmann supervised was being eliminated and his position abolished to eliminate a deficit. The program, however, was not eliminated, although Wichmann and the Center accountant, Bratten, were told that it was to be cut. The University also said both that Wichmann's Associate Director position was eliminated and that it remained unfilled, with there being no immediate plans to fill it. These statements are hard to reconcile. The responsibilities of Wichmann's position were in any case redistributed in substantial part to younger employees.

 There was unrebutted evidence that job descriptions at the Center were meaningless, so it does not help the University that no one was given Wichmann's title. In any event, an employer cannot avoid liability for intentional discrimination by the "simple expedient" of changing job titles. *Riordan v. Kempiners,* 831 F.2d 690, 699 (7th Cir.1987) (Equal Pay Act context); *Soto v. Adams Elevator Equipment,* 941 F.2d 543, 548 (7th Cir.1991) (Under the Equal Pay Act,

"[a]ctual job performance and content, not job titles, are key."); accord *Johnson v. Zema Systems Corp.,* 170 F.3d 734, 743 (7th Cir.1999) (Title VII). Nor, even had the jury accepted that the position had been eliminated, would such an elimination by itself insulate an employer from liability for age discrimination. *See e.g., Stumph v. Thomas & Skinner, Inc.,* 770 F.2d 93, 96 (7th Cir.1985). In part for this reason we need not address whether Wichmann's firing was a Reduction in Force, involving elimination rather than replacement of a position.

The jury could rationally have believed that the deficit in the Wilderness Program, the supposed reason for the firing, was merely a pretext for the illegal termination. Bratten explained that accounting at the Center was manipulated, with surpluses being "disappeared" when necessary to deceive the state government about monies the Center would have otherwise had to repay. Lindberg himself admitted that the Center's accounting was sometimes misleading. Bratten, the Center accountant, was not consulted about the purported deficit. He said that Wichmann's firing made the financial situation of the Center worse. The University is of course entitled to make business decisions, even bad ones, "and it is not for this court to second-guess those decisions. But ... the less sensible an employer's decision appears to be, the more likely it is that the jury will not credit it." *Artis v. Hitachi Zosen Clearing, Inc.,* 967 F.2d 1132, 1140 (7th Cir.1992). The evidence would have reasonably supported the "suspicion of mendacity" which can by itself sustain a finding of intentional discrimination. *Hicks,* 509 U.S. at 511, 113 S.Ct. 2742.

## E. Willfulness

 The University argues that even if Lindberg did fire Wichmann because of his age, no rational jury could have found that Lindberg did so willfully. For willfulness, it must be the case that the employer "did not 'act[ ] reasonably

and in good faith in attempting to determine whether [its action] would violate the ADEA,'" *EEOC v. Century Broadcasting Corp.*, 957 F.2d 1446, 1457 (7th Cir.1992), and that, therefore, the employer "'knew or showed reckless disregard'" for whether its conduct was prohibited by the ADEA. *Id.* (*quoting Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 126, 128–129, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)). We have rejected the view that the employer's "action is not willful unless he knew or was reckless about whether that specific action violated the ADEA." *Id.* at 1465 (Manion, J., dissenting). The term "willful," we have said, "as used in the ADEA[, is] designed to shield the employer who violates the Act without knowing it," *Shager v. Upjohn Co.*, 913 F.2d 398, 406 (7th Cir.1990) (*citing Thurston*, 469 U.S. 111, 128–129, 105 S.Ct.·613, 83 L.Ed.2d 523; *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133–135, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)), and whose ignorance is not reckless. Such cases may be rare, since at this point almost any employer will know that age discrimination is illegal, but they do occur. *See, e.g., Heiar v. Crawford County, Wisconsin*, 746 F.2d 1190, 1197–1199 (7th Cir.1984) (illegal imposition of mandatory retirement age not willful when employer wrongly believed this was permitted by provision allowing age discrimination if "reasonably necessary" for one's business).

 A finding of willfulness is appropriate, however, where a jury could reasonably have found that the violation was "deliberate and indeed bare-faced." *EEOC v. G–K–G, Inc.*, 39 F.3d 740, 749 (7th Cir.1994). The jury could have so found here, although the conclusion was not required. Lindberg knew that it was illegal to fire someone because of his age. We have held that "[n]o inference of guilt can be drawn from [mere] awareness of one's legal obligations," *Partington v. Broyhill Furniture Indus., Inc.*, 999 F.2d 269, 271 (7th Cir.1993), because we do not wish to discourage employers from informing themselves of those obligations. But "innocuous evidence of age awareness" becomes significant when combined with other evidence of discrimination. *Id.* at 271–272.

Given the "old trees" remark together with the more favorable treatment of younger employees, as well as the disbelieved story about the deficit and the elimination of Wichmann's position, this evidence "does permit a reasonable inference of willful discrimination." *Futrell v. J.I. Case*, 38 F.3d 342, 349 (7th Cir.1994). In *Futrell*, the evidence included termination after years of favorable performance reviews, replacement by someone younger, and preparation for an age discrimination lawsuit, which "[t]aking the facts as a whole," allowed a reasonable inference of willfulness. *Id.* at 350. The last sort of evidence is not present here, but here we have the "old trees" remark lacking there. We therefore decline to overturn the jury's finding that the University willfully violated the ADEA by terminating Wichmann because of his age, knowing that this was illegal.

### III. JURY INSTRUCTIONS

 The University requests a new trial on the grounds that it was prejudiced by the trial court's refusal to give the jury what it calls a "business judgment instruction." We construe jury instructions only to determine if "the instructions as a whole were sufficient to inform the jury correctly of the applicable law." *Patel v. Gayes*, 984 F.2d 214, 218–219 (7th Cir.1993). Reversal is warranted only if the mistaken or incomplete instruction "misguides the jury so much that a litigant is prejudiced." *Doe v. Burnham*, 6 F.3d 476, 479 (7th Cir.1993). First, then, we must determine whether the instruction misstates or insufficiently states the law. If so, second, we determine whether error "confused or misled the jury[,] causing prejudice to a litigant." *Id.*

 The jury instructions given were accurate—to find liability only if

"Plaintiff's age was a substantial motivating factor in the decision to terminate his employment, that is, but for Plaintiff's age, his employment would not have been terminated." But according to the University, the jury might have been improperly swayed by the facts that Wichmann was a sympathetic plaintiff, capable, hardworking, popular, and that his firing could have seemed unwise or unfair. The ADEA, the University argues, does not prohibit incompetence, stupidity or general injustice by employers, but only age discrimination. *See Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1399 (7th Cir.1997). The University contends that for these reasons the trial court stated the law insufficiently to the point of misleadingness. Our civil justice system, however, is based on the idea that "the jury is well-equipped to evaluate the evidence and use its good 'common sense' to come to a reasoned decision." *Sheehan*, 173 F.3d 1039, 1999 WL 179015 at *6. A judge "need not deliver instructions describing all valid legal principles...." *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir.1994). Generally speaking, "the judge may and usually should leave the subject to the argument of counsel." *Id.*

■ All parties are entitled to jury instructions which are accurate and complete. But trial courts need not take any extraordinary measures in instructing the jury to protect employers who make foolish or inequitable decisions about sympathetic employees. In employment discrimination law, as in tort law, one takes one's plaintiffs as one finds them, sympathetic or not. Moreover, a defendant cannot escape the fact that a jury must use its good common sense in addressing how much, if at all, the foolishness or unfairness of the employer's decision weighs in the evidence of pretext. Since the challenged jury instruction involved no misstatement or insufficient statement of the law, we need not consider whether the University was prejudiced by any error.

## IV. DAMAGES

### A. Mitigation

■ The University argues, first, that Wichmann failed to mitigate his damages by neglecting to seek a comparable job with reasonable diligence, and so the University was entitled to a reduction or elimination of the damages awarded him. This is an affirmative defense. The magistrate judge who tried the damages portion of this bifurcated action ruled that the University did not carry its burden of proof. A trial court ruling on mitigation is normally sustained unless clearly erroneous, *EEOC v. Gurnee Inn Corp.*, 914 F.2d 815, 818 (7th Cir.1990), but the University's failure-to-mitigate defense turns mainly upon a challenge to the admission of certain evidence, which is to be appraised under the more deferential standard of abuse of discretion. *Taylor v. National Railroad Passenger Corp.*, 920 F.2d 1372, 1375 (7th Cir.1990).

■ The University objects that the trial court, in ruling on this defense, considered evidence of 42 jobs to which Wichmann had unsuccessfully applied which had been the subject of discovery sanctions. Wichmann did, in fact, send 42 job letters to various potential employers seeking employment, but failed to disclose the existence of the letters prior to trial. The trial court excluded these letters from evidence at trial, but allowed Wichmann to testify orally that he had made the applications. The University argues that in view of the trial court's exclusion of the *letters* at trial, it was error to admit the testimony about the *applications* in its mitigation hearing.

This argument is incorrect. The trial court did not exclude all evidence of the applications, but only the letters. The letters were not offered in evidence to satisfy some requirement of a writing but to show that Wichmann made certain job applications. Even if the letters were entirely excluded from consideration, the trial court could properly consider Wichmann's

oral testimony about his applications. "Proportion to the harm is an essential part of sanctions practice." *Smith v. Chicago School Reform Bd. of Trustees*, 165 F.3d 1142, 1147 (7th Cir.1999). The exclusion of the letters from trial was proportionate to Wichmann's failure to disclose them in pretrial proceedings. But if the oral testimony about the jobs was considered by the trial court in the mitigation hearing, that was not abuse of discretion.

■ The University's other arguments concerning mitigation fail to establish clear error in the determination by the court below that Wichmann had made reasonable efforts to mitigate his damages. In view of testimony about Wichmann's 42 applications and other evidence presented, the University's arguments support no "definite and firm conviction that a mistake has been made." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948) (explaining meaning of clearly erroneous standard of review).

### B. Liquidated Damages and "Front Pay"

The University argues that "front pay" is " 'less appropriate where liquidated damages are awarded.' " (*quoting McNeil v. Economics Lab., Inc.*, 800 F.2d 111, 118 (7th Cir.1986)) (*overruled on other grounds by Coston v. Plitt Theatres, Inc.*, 860 F.2d 834 (7th Cir.1988)), and asks us to remit this portion of the damages award. But there was no front pay award. In denying Wichmann's request for front pay, the trial court explained that front pay is an equitable alternative to the reinstatement ordered here instead. *See, e.g., Price*, 966 F.2d at 322. The liquidated damages award is a legal rather than an equitable remedy and was properly awarded because of the finding that the University's violation of the ADEA was willful. *See* 29 U.S.C. § 626(b). The University's characterization and appeal of that court's liquidated damages award are at the very least somewhat careless.

The judgment of the court below is AF-FIRMED.