193 F.3d 64 (2nd Cir. 1999)
 MARY McGINTY, as Administrator of the Estate of Maureen Nash, on behalf of herself and all others similarly situated, and JAMES NASH, on behalf of himself and all others similarly situated, Plaintiffs-Appellants,
v.
STATE OF NEW YORK, NEW YORK STATE AND LOCAL EMPLOYEES' RETIREMENT SYSTEM, and NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE, Defendants-Appellees.
 Docket No. 98-9060
August Term, 1998
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued May 3, 1999
Decided: October 01, 1999
 
 1
 Appeal from a judgment of the United States District Court for the Northern District of New York (Lawrence E. Kahn, Judge) dismissing plaintiffs' claims on the grounds of mootness and lack of standing. On appeal, plaintiffs claim primarily that the district court erred in dismissing their death benefit claims because a continuing live dispute exists between the parties as to whether full relief has been granted. We agree, principally on the ground that plaintiffs are entitled to unpaid liquidated damages. We also agree that the district court should reconsider whether plaintiffs have standing to bring the disability benefit claims because its dismissal of those claims was based in material part on the dismissal of plaintiffs' death benefit claims.
 
 
 2
 Judgment reversed as to the dismissal of plaintiffs' death benefit claims, as to the determination that plaintiffs are not entitled to liquidated damages and as to the dismissal of plaintiffs' disability benefit claims, reversed and remanded for determination of the amount of liquidated damages owed and for resolution of other outstanding death benefit issues, and vacated and remanded for reconsideration of the disability benefit claims in light of our opinion.[Copyrighted Material Omitted]
 
 
 3
 JAMES T. TOWNE, JR., Kingsley and Towne, P.C., Albany, NY (Stuart Potter, Butler, Fitzgerald & Potter, New York, NY, of counsel) for Plaintiffs-Appellants.
 
 
 4
 DANIEL SMIRLOCK, Assistant Attorney General, State of New York (Dennis C. Vacco, Attorney General, Peter H. Schiff, Deputy Solicitor General, Nancy A. Spiegel, Assistant Attorney General, of counsel) for Defendants-Appellees.
 
 
 5
 Before: CABRANES and SACK, Circuit Judges, and SHADUR,* District Judge.
 
 SHADUR, District Judge:
 
 6
 Mary McGinty and James Nash are respectively the Executrix of the Estate and the designated death benefit beneficiary of Maureen Nash ("Nash"), a former employee of the New York State Department of Taxation and Finance ("Department") and, as such, a former member of the New York State and Local Employees' Retirement System ("Retirement System"). Acting on behalf of themselves and all others similarly situated, they brought this action against Department, Retirement System and the State of New York ("State") itself, charging violations of the Age Discrimination in Employment Act ("ADEA," 29 U.S.C. 621-634) as amended by the Older Workers' Benefit Protection Act of 1990 ("Older Workers' Act," Pub. L. No. 101-433, 104 Stat. 978).[1] Plaintiffs (the collective term that we will employ to embrace the entire putative class, not just the name plaintiffs) contend that "similarly situated" individuals include (1)approximately 1,000 people[2] who, like them, received death benefits that were wrongfully reduced because of age in violation of ADEA 623(a) and also (2)many members and former members of Retirement System whose disability benefits have been and are wrongfully reduced because of age.
 
 
 7
 Defendants concede, and the district court (Lawrence E. Kahn, J.)[3] found it undisputed, that the New York Retirement and Social Security Law ("New York's Retirement Law") 62(b), 448(a)(2), 507, 508(a)(2) and 606(a)(2), the statute controlling the calculation of death benefits payable to Retirement System members' beneficiaries, does not comply with ADEA. It is equally undisputed that because New York's Retirement Law had continued to make improper distinctions in benefits on the basis of age in violation of ADEA as amended by the Older Workers Act, Retirement System had knowingly violated ADEA for several years by paying the inadequate death benefits called for by New York's Retirement Law.
 
 
 8
 Nonetheless the district court found that Retirement System's ultimate administrative correction of the death benefit system in the face of inaction by the New York legislature, and Retirement System's consequent additional payments of what it viewed as the required corresponding compensatory damages to the death benefit beneficiaries, had rendered plaintiffs' claims moot (14 F.Supp. 2d at 246-51). Additionally the district court found that the name plaintiffs lacked standing to maintain a claim on behalf of Retirement System members who had suffered age discrimination with respect to disability benefits rather than death benefits (id. at 251).
 
 
 9
 Accordingly, the district court granted defendants' Fed. R. Civ. P. ("Rule") 12(b)(1) motion to dismiss the case for lack of subject matter jurisdiction, and plaintiffs now appeal. We reverse the district court's dismissal of plaintiffs' death benefit claims as moot and hold plaintiffs entitled to the claimed statutory liquidated damages, and we vacate the district court's dismissal of the disability benefit claims sought to be advanced by plaintiffs. We remand for reconsideration in light of this opinion both the unresolved issues as to the death benefit claims and the question whether the name plaintiffs lack standing to assert the disability benefit claims.
 
 Background
 
 10
 From October 16, 1992 until June 20, 1996 defendants, acting pursuant to New York's Retirement Law, admittedly violated ADEA by maintaining and implementing a death benefit system that discriminated unlawfully against New York state and municipal employees because of their age.[4] Plaintiffs claim that since October 16, 1992 (and continuing through the present) defendants have also maintained and implemented a disability benefit system that violates ADEA.[5]
 
 
 11
 New York's Office of the State Comptroller (the administrative head of the retirement system and trustee of the Retirement System's fund), aware that New York's Retirement Law did not comply with the Older Workers Act amendments, repeatedly attempted without success to have the state law amended by the New York legislature. In 1992 the Comptroller's Office had commissioned a report from Buck Consultants, an employee benefits consulting firm, to analyze New York's Retirement Law's death and disability benefit provisions and to recommend any necessary changes to the benefit structure to comply with the Older Workers Act. Despite the Buck Report's adverse findings as to the New York provisions' noncompliance with ADEA's requirements, despite that Report's consequent recommendations for statutory amendments to bring the New York system into compliance, and despite the support of New York's Governor for the Comptroller's efforts in that regard, the New York legislature (which was of course the ultimate authority for instituting any such state law changes) did nothing.
 
 
 12
 Ultimately the Comptroller's Office, confronted by the dilemma of New York's continued statutory noncompliance with the overriding mandate of ADEA, decided to implement the Buck Report's death benefit recommendations although the New York Retirement Law itself remained unchanged. Accordingly, Retirement System began to calculate the revised amounts in June and July 1996, and it began to make the calculated supplemental payments in stages, beginning later in 1996 and continuing on into 1997 and beyond.
 
 
 13
 Meanwhile, after Nash's death early in 1995 Retirement System had paid her named beneficiary James Nash an ordinary death benefit of $36,671.44 under the Retirement Law's ADEA-violative formula, an amount that was both (1)less than the benefit that would have been paid had Nash joined Retirement System before turning 52 and (2)less than the benefit that would have been paid had Nash died before turning 61. By an original charge filed early in 1996, and then by an April 1996 amendment to that charge that identified Retirement System as the discriminatory state agency, plaintiffs tendered to the United States Equal Employment Opportunity Commission ("EEOC") their complaints of age discrimination. In October 1996, at substantially the same time that a Retirement System benefits examiner communicated with James Nash seeking to provide him with forms to process a differential payment in conformity with the Buck Report's formulation, plaintiffs brought this action in the Northern District of New York, requesting monetary and injunctive relief, costs, attorney's fees and disbursements, and such other relief as the court deemed just and proper.
 
 
 14
 In response to plaintiffs' interrogatories, defendants admitted their original ADEA violations in the payment of death benefits for those whose benefits had been calculated under the age-discriminatory provisions of New York's Retirement Law. They also disclosed the names of Retirement System members who were discriminated against with respect to those benefits, the identity of the death beneficiaries of those members, the original death benefits paid to those beneficiaries and the adjusted amounts that defendants believe should have been paid. According to defendants' records the overall death benefits had originally been wrongfully reduced by approximately $20.8 million.
 
 
 15
 As stated earlier, it was in June 1996 (nearly four years after ADEA, as amended by the Older Workers' Act, had been extended to cover employee retirement benefit plans) that Retirement System implemented the Buck Report's recommendations of a revised method of calculating death benefits that it contends is in compliance with ADEA (though plaintiffs dispute that). When in July 1996 Retirement System began to make further payments to the beneficiaries who had been affected by the acknowledged discrimination in earlier death benefit payments, each of those added payments was in an amount equal to the difference between the initial benefit and the recalculated benefit, plus 5% annual interest from the date of death.
 
 
 16
 Plaintiffs assert that the new method is still not in compliance with ADEA, that they are still entitled to liquidated damages resulting from the improper death benefit payments and that defendants continue to make unlawfully reduced payments to disability claimants. In that last respect, plaintiffs claim that the class of injured disability claimants exceeds 10,000 members. Plaintiffs also claim (and it would certainly seem likely in terms of sheer statistical probability, given the large numbers of members in each category) that many death benefit decedents also had disability discrimination claims, but plaintiffs cannot confirm that claim absent defendants' compliance with their discovery requests.
 
 Standard of Review
 
 17
 We review de novo a dismissal of a cause of action under Rule 12(b)(1)(see, e.g., Jaghory v. New York State Dep't of Educ., 131 F.3d 326, 329 (2d Cir. 1997) and cases cited there). To that end we must accept all factual allegations in the complaint as true and draw inferences from those allegations in the light most favorable to plaintiffs (id.).
 
 Mootness of Death Benefit Claims
 
 18
 We first address whether the District Court correctly determined that plaintiffs' death benefit claims are moot. Comer v. Cisneros, 37 F.3d 775, 798 (2d Cir. 1994) has reconfirmed the teaching of earlier precedent that "a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." And Church of Scientology v. United States, 506 U.S. 9, 12 (1992)(citation omitted) has stressed that a case is moot only if it is "impossible for the court to grant 'any effectual relief whatever' to a prevailing party." Hence district courts (and appellate courts as well) should focus their mootness inquiries on whether there is a legitimate continuing dispute between the parties. And here the analysis readily reveals that to be the case.
 
 
 19
 First, plaintiffs continue to maintain a viable claim for liquidated damages. ADEA 626(b), incorporating the corresponding provisions of the Fair Labor Standards Act, mandates the payment of liquidated damages in an amount equivalent to a plaintiff's award for back pay and benefits where the statutory violation was "willful." Defendants seek to escape that mandate as the source of a live dispute by urging (1)that their admittedly ADEA-violative payments were not "willful" violations and (2)that liquidated damages under ADEA are punitive, so that they are not potentially awardable in the absence of a viable claim for compensatory damages.
 
 
 20
 As to the first of those contentions, violations of ADEA are "willful" according to Hazen Paper Co. v. Biggins, 507 U.S. 604, 614 (1993) (citations and quotations omitted) "if the employer knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." Those alternatives are stated in terms of the disjunctive "or," not the conjunctive "and." And there is no doubt as to New York's having known that the amounts of its death benefit payments were ADEA-prohibitedas the district court itself said (14 F.Supp.2d at 248):
 
 
 21
 Here, it is not disputed that the defendants knew that the old benefit structure discriminated on the basis of age without cost-justification.
 
 
 22
 It is critical to the analysis that (1) the State itself is the employer here (and is a defendant in this action) and (2)that "willfulness" liability for ADEA violations exists if the employer knows that its conduct violates the statutesomething that was unquestionably the case here. After all, to speak of the knowing commission of a statutory violation as having been taken in "good faith" is to pose a classic oxymoron. Instead the presence or absence of good faith is relevant only where the employer holds such a good faith belief that its conduct is not ADEA-violativeand only that good-faith alternative is measured by the absence of "reckless disregard." Thus in reaffirming the TWA v. Thurston, 469 U.S. 111 (1985) definition of "willful" as requiring only a showing that "the employer knew or showed reckless disregard", Hazen Paper, 507 U.S. at 617 neither mentioned nor suggested any requirement that the employer should also be found to have acted in subjective bad faith (and see Thurston, 469 U.S. at 126 n.19).
 
 
 23
 As the Seventh Circuit has put the matter succinctly in a recent per curiam opinion, Wichmann v. Board of Trustees of Southern Ill. Univ., 180 F.3d 791, 804 (7th Cir. 1999)(internal quotation marks, brackets and citations, including one to Thurston, omitted):
 
 
 24
 The term "willful," we have said, as used in the ADEA, is designed to shield the employer who violates the Act without knowing it, and whose ignorance is not reckless.
 
 
 25
 In sum, a knowing violation necessarily equates to a willful violation for statutory purposes, with the notion of "reckless disregard" being relevant only as an alternative thatabsent proof of actual knowledgeis deemed to be its equivalent. This is no different from the familiar criminal law concept applicable where criminal responsibility depends on a showing of a known violation of law. If actual knowledge is proved, that is obviously enough to satisfy that element. It is where such actual knowledge cannot be shown that juries may be given an "ostrich" instructionone that treats reckless disregard of the facts as sufficient to satisfy the requirement of knowledge.
 
 
 26
 In this case there is no dispute that the New York Controller's office sought without success to get ADEA-compliant action from the New York legislature. But the legislature's inaction was by definition the State's inaction, and the State as defendant cannot obtain insulation from ADEA willfulness liability because of the fact that its administrators had tried and failed (in a manner that evidenced their good faith) to get the ultimate authoritythe legislatureto take the necessary action.
 
 
 27
 In that respect we do not agree with the district court's ruling that an employer's behavior cannot be "conduct" within that case's definition of willfulness unless it takes the form of an affirmative act rather than a failure to act. That attempted distinction is at odds with the normal reading of the concept of "conduct." Nothing either in Hazen Paper or in Stratton v. Department for the Aging, 132 F.3d 869, 881 (2d Cir. 1997), upon which the district court sought to rely, indicates that the conduct at issue must qualify as an affirmative act in that sense. Indeed, even on that overly constricted reading Retirement System's "conduct" took the affirmative form of continuing to pay lower benefits despite the realization that ADEA was being actively violated by those payments.
 
 
 28
 Nor does the holding in EEOC v. Illinois, 69 F.3d 167, 169 (7th Cir. 1995) assist the district court's position. That case held that a state legislature's failure to repeal an ADEA-preempted state law that set a mandatory retirement age did not aid and abet a local school board's violation of ADEA by enforcing the state law. But in EEOC v. Illinois the plaintiffs who sought to sue the State were employees of the local school district and not of the State itself, while here the State itself is the statutorily offending employer. This case involves precisely the kind of direct employer liability called for by the statute, not the aider-and-abetter liability that was attempted to be imposed in EEOC v. Illinois. Unlike that case, plaintiffs here have sued the offending employer (the State of New York), fully satisfying the position advanced in EEOC v. Illinois, 69 F.3d at 170 that its plaintiffs should have sued the "persons whose acts hurt" them (here those persons are both the employer State and those in charge of distributing the benefits, all of whom have been named as defendants). EEOC v. Illinois did not suggest that the school district would be protected simply because its "conduct" involved only a failure to remedy the discriminatory system that it was implementing.
 
 
 29
 We find equally unpersuasive defendants' second argument for the mootness of plaintiffs' claim for liquidated damages--that such damages are punitive and therefore cannot be granted where there is no longer a viable claim for compensatory damages.[6] ADEA's added liquidated damages may fairly be characterized as "punitive in nature" (see Reichman v. Bonsignore, Brignati & Mazzotta, P.C., 818 F.2d 278, 282 (2d Cir. 1987), citing Thurston, 469 U.S. at 125-26 for the proposition that liquidated damages are designed to deter willful violations of ADEA rather than to compensate the victim)they do after all provide an ADEA victim with more than his or her out-of-pocket damages or any other strictly compensatory amounts. But that does not at all bring liquidated damages within the ambit of cases holding in other contexts that a plaintiff cannot collect punitive damages where he or she has failed to demonstrate that defendants' conduct has caused plaintiff to suffer any actual damages.
 
 
 30
 In sharp contrast, plaintiffs here unquestionably suffered actual damages at the time that defendants willfully paid them less in death benefits than ADEA required upon the deaths of their decedents. If defendants were correct that plaintiffs' consequent statutory right to liquidated damages could be wiped out by defendants' later preemptive distribution of the willfully-caused deficit in those death benefits, any ADEA defendant could violate the law with impunity, then avoid its statutory obligation to pay liquidated damages simply by paying off plaintiffs' compensatory damages claims before resolution of the suit.
 
 
 31
 That cannot be and is not the law. United States v. Bornstein, 423 U.S. 303, 313-17 (1976) dealt with a similar issue in the False Claims Act context. There defendants had tendered partial payment of the compensatory damages before trial, and the lower courts calculated the "double damages" by doubling only the amount remaining to be paid. Bornstein, 423 U.S. at 316 rejected that formula and held that double damages should be calculated by doubling the actual damages owed before any subtractions were made for previously received payments:
 
 
 32
 [T]he reasoning of the Court of Appeals and the District Court would enable the subcontractor to avoid the Act's double-damages provision by tendering the amount of the undoubled damages at any time prior to judgment. This possibility would make the double-damages provision meaningless.
 
 
 33
 ADEA's mandatory liquidated damages provision would be rendered equally meaningless if defendants' preemptive payment of compensatory damages were held to eliminate plaintiffs' claim for the statutorily specified further relief for willful violations.
 
 
 34
 In addition to their claim for liquidated damages, plaintiffs continue to assert that defendants' new administrative method of calculating death benefits does not comply with ADEA. In dismissing that claim as moot, the district court relied on the fact that plaintiffs "provided no evidence to contradict or place in doubt the findings of Buck Consulting's report" that the new method is in compliance with ADEA (14 F.Supp.2d at 247). As already suggested, the district court's mootness inquiry should have focused not on whether plaintiffs had demonstrated the merits of their position at the threshold, but rather on the existence of any continuing dispute on that score. Here plaintiffs' claim that the new formula still violates ADEA provides a continuing live dispute over the sufficiency of defendants' actions in curing their ADEA violations. That continued dispute, which must be addressed on remand, further requires the reversal of the district court's determination that plaintiffs' death benefit claims were moot.
 
 Eleventh Amendment Immunity
 
 35
 Defendants assert incorrectly that they are immune from suit under the Eleventh Amendment because ADEA contains no clear statement of Congress' intent to subject States to suits by individuals in federal court. Cooper v. New York State Office of Mental Health, 162 F.3d 770, 776 (2d Cir. 1998), petition for cert. filed, 67 U.S.L.W. 3614 (U.S. Mar. 23, 1999)(No. 98-1524) holds precisely to the contrary:
 
 
 36
 While it is true that 626(c) is phrased in general terms"any person aggrieved" may sue in "any court of competent jurisdiction"the combination of the amendments to "employer" and "employee" and the availability of private damage actions makes it clear that States are intended to be subject to liability under 626(c). The fact that the States are not named again in the enforcement section does not make ambiguous otherwise clear statements of intent to abrogate. Indeed, 626(c) does not use the term "employer" at all; by this omission, should we conclude that Congress did not state clearly its intent to subject any employer, public or private, to the enforcement provision of the Act? Surely such a conclusion would be an absurdity.
 
 Standing as to Disability Benefit Claims
 
 37
 Based in material part (though not entirely) on its dismissal of plaintiffs' death benefit claims as moot, the district court determined that plaintiffs also lacked standing to bring disability benefit claims on behalf of others (14 F.Supp.2d at 251). As the district court viewed the matter, plaintiffs' lack of a personal stake in the death benefit claims because they had been fully paid (a holding we have rejected here) disqualified them as representatives to assert claims for allegedly uncompensated disability claimants.
 
 
 38
 In light of our reversal on the principal mootness issue, the district court's dismissal of the disability benefit claims is vacated and remanded for reconsideration of the standing issue (which may be a function of the extent of commonality or lack of commonality of the issues posed by the death benefit claims and those presented by the disability benefit claims). If the question of standing is resolved in plaintiffs' favor, the disability benefit claims will go forward on the merits.
 
 Plaintiffs' Motions
 
 39
 Finally, several of Plaintiffs' motions were also denied by the district court based on its mootness determination. On remand those motions (except to the extent that they have been resolved by our rulings on this appeal) should also be addressed on their merits.
 
 Conclusion
 
 40
 We REVERSE the district court's dismissal of plaintiffs' death benefit claims and hold that plaintiffs are entitled to their claimed statutory liquidated damages, and we REMAND for a determination of those damages and for the resolution of any other open issues regarding death benefits. We VACATE the district court's dismissal of plaintiffs' assertion of disability benefit claims for lack of standing and REMAND that standing issue for reconsideration in light of this decision, with those claims to go forward on the merits if the question of standing is resolved in plaintiffs' favor.
 
 
 
 Notes:
 
 
 *
 The Honorable Milton I. Shadur, of the United States District Court for the Northern District of Illinois, sitting by designation.
 
 
 [1]
 All citations to ADEA, including the 1990 amendments, will take the form "ADEA --," using the section numbering in the Title 29 codification rather than the internal numbering of either act.
 
 
 [2]
 384 of those individuals have joined with the name plaintiffs in this action.
 
 
 [3]
 Judge Kahn's opinion is reported at 14 F.Supp.2d 241 (N.D. N.Y. 1998).
 
 
 [4]
 New York's Retirement Law discriminated based on age in two ways: First, death benefits were reduced if the member joined after turning 52 and second, death benefits were reduced by 10% for each year that the member remained employed after turning 60, but subject to a floor of 10% of the benefit in force at age 60.
 
 
 [5]
 Plaintiffs claim that New York's Retirement Law 62(b) and 507 discriminate based on age because they lower the amount of disability benefits for members who join Retirement System after turning 40 or who become disabled after turning 60 (or both).
 
 
 [6]
 Defendants make the further point that liquidated damages, if allowed in an ADEA action, are granted in an amount equivalent to a plaintiff's award for back pay and benefits (29 U.S.C. 626(b)). But we find that adds no force to defendants' position, in light of the ensuing text discussion.