**Mary McGINTY, as Administratrix of the Estate of Maureen Nash, and James Nash on behalf of themselves and all others similarly situated, Plaintiffs–Appellants,**

v.

**State of NEW YORK, New York State and Local Employees Retirement System, and New York State Department of Taxation and Finance, Defendants–Appellees.**

**Docket No. 00–7189.**

United States Court of Appeals, Second Circuit.

Argued Oct. 20, 2000.

Decided May 22, 2001.

88

James T. Towne, Jr., Albany, NY (Thorn Gershon Towne Tymann and Bonanni, LLP, Albany, NY, of counsel), for Plaintiffs–Appellants.

Laura Etlinger, Albany, NY (Eliot Spitzer, Attorney General of the State of New York, Nancy A. Spiegel, Daniel Smirlock, Albany, NY, of counsel), for Defendants–Appellees.

Before: CARDAMONE, SOTOMAYOR, and KATZMANN, Circuit Judges.

CARDAMONE, Circuit Judge:

The evolution of this appeal illustrates the potential consequences when a decree of the Supreme Court is applied retroactively to a different case open at the time it is issued. Just prior to the decree, plaintiffs were well on their way to recovering damages for age discrimination in pension benefits concededly committed by the State of New York. When the Supreme Court ruled, in another case, that states had sovereign immunity from suit under the statute upon which plaintiffs had been relying, plaintiffs' prospects for victory vanished like spent light.

Plaintiff Mary McGinty is the executrix [1] of the estate of Maureen Nash, who was employed by the New York State Department of Taxation and Finance (Department) and a member of the New York State and Local Employees' Retirement System (Retirement System). Her death benefit beneficiary was plaintiff James Nash. Plaintiffs McGinty and Nash, acting on behalf of themselves and all others similarly situated, filed suit against defendants, the Retirement System, the State of New York (State) and the Department under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634, as amended by the Older Workers Benefit Protection Act of 1990, Pub.L. No. 101–433, 104 Stat. 978. In particular, plaintiffs challenge what they claim were wrongful reductions in certain death and disability benefits based upon the age of the Retirement System member.

Plaintiffs appeal to this Court for a second time, seeking reversal of a judgment entered in favor of defendants by the United States District Court for the Northern District of New York (Kahn, J.). *See McGinty v. New York*, 84 F.Supp.2d 314 (N.D.N.Y.2000). On plaintiffs' first appeal from an adverse judgment, we reversed in part and remanded for further proceedings. *See McGinty v. New York*, 193 F.3d 64, 72 (2d Cir.1999). The key issue on the appeal now before us is whether the federal courts have subject matter jurisdiction over the State of New York defendants in light of the Supreme Court's recent decision in *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 67, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000), holding that the ADEA does not validly abrogate states' Eleventh Amendment sovereign immunity. Relying on *Kimel*, the district court dismissed plaintiffs' complaint *sua sponte*. *See McGinty*, 84 F.Supp.2d at 314–15.

---

1. Plaintiffs note that the title of "administratrix" in the caption is in error, but they were denied an opportunity to amend their complaint.

## BACKGROUND

The facts are set forth in detail in our prior opinion, with which familiarity is presumed. *See McGinty,* 193 F.3d at 67–68. We set out only those facts relevant to the present appeal.

### Payment of Death Benefits

Defendants admit that for some three-and-a-half years, from October 16, 1992 to June 20, 1996, the New York State death benefit system violated the ADEA. *McGinty,* 193 F.3d at 67. Death benefits were reduced when an employee joined the Retirement System after turning age 52, and were further reduced 10 percent for each year the employee worked after turning age 60, subject to a floor of 10 percent of the benefit in force at age 60. N.Y. Retire. & Soc. Sec. Law § 508(a)(2) (McKinney 1999); *accord McGinty,* 193 F.3d at 67 n. 4. Maureen Nash became a member of the Retirement System at age 53 and died at age 62 while still employed; her death benefit was thereby reduced under state law, in what defendants concede was a violation of the ADEA.

Plaintiffs filed complaints of age discrimination with the Equal Employment Opportunity Commission (EEOC) in early 1996. *McGinty,* 193 F.3d at 68. At the same time, the state comptroller's office— which was unable to persuade the legislature to amend the law—decided to correct the ADEA violations by voluntarily making supplemental death benefit payments. *Id.* at 67. It began making such payments in late 1996. *Id.* at 67–68. In October 1996 a benefits examiner contacted James Nash as Maureen Nash's beneficiary regarding the differential payment. *Id.* at 68. Plaintiffs commenced the instant class action in federal district court on October 17, 1996.

### Prior Proceedings

When plaintiffs brought their first appeal, the district court had dismissed their action on defendants' motion under Fed. R.Civ.P. 12(b)(1). We reversed the determination that plaintiffs' death benefit claims were moot in light of the Retirement System's corrective supplemental payments, and ruled instead that the ADEA violations were "willful" and that plaintiffs were therefore entitled to liquidated damages under the ADEA. *Id.* at 69–71. We remanded for a determination of damages and for a resolution of plaintiffs' charge that the new administrative method for calculating death benefits still violated the ADEA. *Id.* at 71. We also vacated the dismissal of plaintiffs' disability benefit claims and remanded for the district court to reconsider plaintiffs' standing to bring these claims. *Id.* at 72. Finally, we rejected defendants' assertion of sovereign immunity. *Id.* at 71–72 (quoting *Cooper v. N.Y. State Office of Mental Health,* 162 F.3d 770, 776 (2d Cir.1998), *vacated sub nom. Bd. of Trustees of Univ. of Conn. v. Davis,* 528 U.S. 1110, 120 S.Ct. 928, 145 L.Ed.2d 806 (2000)).

Meanwhile, after plaintiffs had filed their appeal on July 31, 1998, but before we issued our decision on October 1, 1999, the Supreme Court granted certiorari in *Kimel. Kimel v. Fla. Bd. of Regents,* 139 F.3d 1426 (11th Cir.1998), *cert. granted,* 525 U.S. 1121, 119 S.Ct. 901, 142 L.Ed.2d 901 (1999). Following our decision on the first appeal, defendants requested the district court to stay the matter pending the Supreme Court's determination in *Kimel.* That request was granted on October 7, 1999.

*Kimel* was decided on January 11, 2000. On January 19, 2000 the district court *sua sponte* dismissed plaintiffs' claims for lack of subject matter jurisdiction. In a brief order it cited *Kimel*'s holding that Con-

gress did not validly abrogate states' sovereign immunity when it passed the ADEA. *McGinty*, 84 F.Supp.2d at 314. The trial court gave the parties no advance notice that dismissal was contemplated and afforded them no opportunity to brief the question of subject matter jurisdiction. From that order, plaintiffs appeal.

## DISCUSSION

■ On appeal from a decision regarding subject matter jurisdiction, we review factual findings for clear error and legal conclusions *de novo*. *Viacom Int'l, Inc. v. Kearney*, 212 F.3d 721, 725–26 (2d Cir.), *cert. denied*, —— U.S. ——, 121 S.Ct. 655, 148 L.Ed.2d 558 (2000).

### I Propriety of District Court's *Sua Sponte* Dismissal

■ Whether a federal court has subject matter jurisdiction is a question that "may be raised at any time ... by the court *sua sponte*." *Lyndonville Sav. Bank & Trust Co. v. Lussier*, 211 F.3d 697, 700 (2d Cir.2000). Thus, the district court properly considered whether in light of *Kimel* defendants had sovereign immunity that deprived it of subject matter jurisdiction. Having found this immunity could be and was raised, the district court had reason to dismiss plaintiffs' complaint. *See id.* at 700–01 ("If subject matter jurisdiction is lacking, the action must be dismissed.").

■ Yet, the district court inappropriately dismissed the case without informing plaintiffs it was contemplating such action. A district court should not dismiss an action pending before it without first providing the adversely affected party with notice and an opportunity to be heard. *Acosta v. Artuz*, 221 F.3d 117, 124 (2d Cir. 2000). Notice serves several important purposes. It gives the adversely affected party a chance to develop the record to

show why dismissal is improper; it facilitates *de novo* review of legal conclusions by ensuring the presence of a fully-developed record before an appellate court, *see B.F. Goodrich v. Betkoski*, 99 F.3d 505, 522 (2d Cir.1996); and, it helps the trial court avoid the risk that it may have overlooked valid answers to what it perceives as defects in plaintiff's case, *Snider v. Melindez*, 199 F.3d 108, 113 (2d Cir.1999). For example, while the district court ruled the ADEA did not abrogate defendants' right to assert sovereign immunity, it failed to address whether immunity might have been waived or whether the Retirement System was entitled to assert immunity as an arm of the state. Either a "yes" answer to the first question, or a "no" answer to the second, would have required a different result.

■ Recognizing that a *sua sponte* dismissal absent notice and an opportunity to be heard can itself be grounds for reversal, *Lewis v. New York*, 547 F.2d 4, 5–6 & n. 4 (2d Cir.1976), we nevertheless undertake to address the issues raised on this appeal ourselves. Unlike *Lewis*, where defendants refused to defend the merits of the district court's *sua sponte* dismissal because they had never been served, plaintiffs and defendants here have fully briefed all the questions raised on this appeal. Since those issues are predominantly of a legal nature, we believe we are adequately informed to decide them. *Cf. Stone v. Williams*, 970 F.2d 1043, 1061 (2d Cir. 1992) (question not passed on by district court was addressed because the facts were undisputed and the legal question fully briefed).

### II Applicability of *Kimel*

■ Prior to the Supreme Court's decision in *Kimel*, plaintiffs had prevailed in this action. Regarding the sequence of

events relative to a Supreme Court pronouncement, when that "Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review." *Harper v. Va. Dep't of Taxation,* 509 U.S. 86, 97, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993).

■ The Eleventh Amendment provides The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. That Amendment bars suits that seek either money damages, *see Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (recognizing that "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment"), or injunctive relief, *see Cory v. White,* 457 U.S. 85, 90–91, 102 S.Ct. 2325, 72 L.Ed.2d 694 (1982) (holding that "the Eleventh Amendment by its terms clearly applies to a suit seeking an injunction").

■■ Although sovereign immunity extends beyond the literal text of the Eleventh Amendment to bar a citizen from suing his own state under federal question jurisdiction, *see Hans v. Louisiana,* 134 U.S. 1, 15, 10 S.Ct. 504, 33 L.Ed. 842 (1890), there are two recognized exceptions to the bar: when Congress authorizes such a suit through enforcement of § 5 of the Fourteenth Amendment, and where a state consents to being sued. *College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 670, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999). *Kimel* examines the first exception with respect to the ADEA.

■ To determine whether Congress properly abrogated states' Eleventh Amendment immunity, two questions are asked. *See Kimel,* 528 U.S. at 73, 120 S.Ct. 631. First, did Congress unequivocally express its intent to abrogate immunity? And second, did Congress act pursuant to a valid grant of constitutional authority? *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 55, 59, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). The Supreme Court answered the first question "yes," saying that the plain language of the ADEA "clearly demonstrates Congress' intent to subject the States to suit for money damages at the hands of individual employees." *Kimel,* 528 U.S. at 74, 120 S.Ct. 631. But the answer to the second question was "no."

■ The Supreme Court had previously ruled that the ADEA's embrace of state governments within its ambit was constitutional as an exercise of Congress' Commerce Clause powers under Article I of the Constitution. *See EEOC v. Wyoming,* 460 U.S. 226, 243, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983). *Kimel,* however, reaffirmed the holding of *Seminole Tribe* that Article I "[did] not include the power to subject States to suit at the hands of private individuals." 528 U.S. at 80, 120 S.Ct. 631. The Court therefore turned its attention to § 5 of the Fourteenth Amendment where it applied a "congruence and proportionality" test to decide whether a federal statute is appropriate remedial legislation or improper legislation that purports to redefine the Fourteenth Amendment right at issue. *Id.* at 81–82, 120 S.Ct. 631. Because age is not a suspect classification under the Equal Protection clause, states may discriminate on the basis of age if the age classification is rationally related to a legitimate state interest. *Id.* at 83, 120 S.Ct. 631.

Surveying cases in which states were found not to have violated the Equal Protection clause by relying on broad generalizations regarding age, the Supreme Court observed that "it is clear that the ADEA is 'so out of proportion to a supposed remedial or preventive object that it cannot be understood as responsive to, or designed to prevent, unconstitutional behavior.'" *Id.* at 86, 120 S.Ct. 631 (quoting *City of Boerne v. Flores,* 521 U.S. 507, 532, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). Nothing in the legislative history of the ADEA, the Court continued, indicated Congress had identified a pattern of age discrimination by the states, or that any discrimination rose to the level of a constitutional violation. *Id.* at 89–91, 120 S.Ct. 631. Hence, it concluded

> In light of the indiscriminate scope of the Act's substantive requirements, and the lack of evidence of widespread and unconstitutional age discrimination by the States, we hold that the ADEA is not a valid exercise of Congress' power under § 5 of the Fourteenth Amendment. The ADEA's purported abrogation of the States' sovereign immunity is accordingly invalid.

*Id.* at 91, 120 S.Ct. 631.

Plaintiffs attempt to distinguish *Kimel* by seizing upon the opinion's language reviewing the rational relationship test under the Equal Protection clause and the ADEA's legislative history. Plaintiffs highlight defendants' willful violations of the ADEA. Yet, while no one disputes the willful nature of defendants' actions, the Supreme Court made clear that ADEA violations do not necessarily translate into violations of the Equal Protection clause. *See Kimel,* 528 U.S. at 86, 120 S.Ct. 631 ("The [ADEA], through its broad restriction on the use of age as a discriminating factor, prohibits substantially more state employment decisions and practices than

would likely be held unconstitutional under the applicable equal protection, rational basis standard.").

Pressing their argument, plaintiffs maintain that defendants' calculation of death benefits is a form of age discrimination with no rational relationship to a legitimate state interest. Even assuming defendants' conduct rose to the level of a constitutional violation, such would not show a pattern of unconstitutional age discrimination by the states across the nation sufficient to justify the broad prohibitions in the ADEA. Moreover, nothing in *Kimel* suggests sovereign immunity is limited under the ADEA should a state engage in age discrimination in violation of the Equal Protection clause. Rather, the Supreme Court unequivocally stated that "the ADEA does not validly abrogate the States' sovereign immunity." *Id.* at 92, 120 S.Ct. 631.

█ Consequently, while an aggrieved party can pursue avenues other than the ADEA when faced with age discrimination, *see id.* at 91–92 & n. *, 120 S.Ct. 631, it clearly cannot mount an ADEA claim against a state without its consent in federal court, *see id.* at 73, 120 S.Ct. 631 ("[T]he Constitution does not provide for federal jurisdiction over suits against nonconsenting States."). Since plaintiffs in this case assert federal question jurisdiction premised solely on the ADEA, they may continue their suit only if defendants waived immunity. We turn next to that issue.

### III Waiver of Sovereign Immunity

█ Plaintiffs contend defendants waived immunity by declining to raise it as a defense and instead participating in the EEOC proceeding initiated when plaintiffs filed their complaint with the agency. The standards for finding waiver were recently reiterated. Since a waiver of immunity is

voluntary, made either by invoking federal jurisdiction or by a clear declaration, a "stringent" test is used to determine whether waiver has occurred. *College Sav. Bank,* 527 U.S. at 675–76, 119 S.Ct. 2219.

Before addressing the merits of plaintiffs' contention, we pause to consider defendants' argument that it was not possible for them to have raised an immunity defense before the EEOC since states are deemed to have consented to suits brought by the federal government. *See Alden,* 527 U.S. at 755, 119 S.Ct. 2240. The ADEA does give the EEOC authority to enforce employees' rights under the statute. *See* 29 U.S.C. § 626(c)(1) (1994) ("[T]he right of any person to bring such action [under the ADEA] shall terminate upon the commencement of an action by the [EEOC]...."). This enforcement, however, occurs when the EEOC brings suit in federal court. *See, e.g., EEOC v. Kidder, Peabody & Co.,* 156 F.3d 298, 300 (2d Cir.1998) (indicating the EEOC filed a complaint in federal court pursuant to the ADEA). That procedure is distinct from an individual filing a complaint with the agency.

In addition, the Supreme Court in *Alden* explained that the concerns associated with a state being able to assert sovereign immunity in a suit brought by private persons do not exist when a suit "is commenced and prosecuted against a State in the name of the United States by those who are entrusted with the constitutional duty to 'take Care that the Laws be faithfully executed.'" 527 U.S. at 755, 119 S.Ct. 2240 (quoting U.S. Const. art. II, § 3). Nothing before us suggests that plaintiffs' complaint with the EEOC was commenced or prosecuted in the name of the federal government.

▋ Returning to plaintiffs' argument, they make no representation that defen-

dants expressly consented to being sued in district court. *See College Sav. Bank,* 527 U.S. at 676, 119 S.Ct. 2219. Instead, plaintiffs assert defendants' failure to raise the immunity defense before the EEOC was tantamount to affirmatively invoking federal jurisdiction. But the cases upon which plaintiffs rely to demonstrate this proposition are factually distinguishable.

For example, in *Clark v. Barnard,* 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883), a state waived sovereign immunity when it voluntarily appeared in court prosecuting its claim to a fund that was the subject of the controversy. Because it intervened as an actor as well as a defendant, the court had to adjudicate the adverse rights of the parties, including the state, to the fund. *Id.* at 448, 2 S.Ct. 878. The same cannot be said of defendants in the pending appeal. They were all named as respondents in plaintiffs' EEOC proceeding and as defendants in the instant action. No intervention occurred, no claims were asserted by the state defendants, and no resolution of issues other than those presented by plaintiffs' complaints had to be resolved.

Plaintiffs also rely on *Gardner v. New Jersey,* 329 U.S. 565, 67 S.Ct. 467, 91 L.Ed. 504 (1947). In that case a state filed a claim against a debtor's estate, which was subject to the rulings of the bankruptcy court. Where a state is an actor, seeking something as a claimant, it waives any immunity it might otherwise have respecting adjudication of the claim. *Id.* at 573–74, 67 S.Ct. 467. Here, none of the state defendants filed claims before the EEOC or the district court. The facts underlying *Gardner* therefore are inapposite.

Finally, plaintiffs point to one of our decisions to show defendants' participation in the EEOC proceeding amounts to a waiver of immunity. In that case, the state of New York imposed a gains tax

upon a debtor about to sell its interest in a hotel as part of a reorganization plan. *995 Fifth Ave. Assocs., L.P. v. N.Y. State Dep't of Taxation & Fin. (In re 995 Fifth Ave. Assocs., L.P.)*, 963 F.2d 503, 506 (2d Cir. 1992). The debtor sought a declaration in bankruptcy court that it was exempt from the tax and entitled to a refund from the state. The state filed an administrative expense claim for additional gains tax liability. The lower courts considered that act of filing to be a waiver of sovereign immunity. The bankruptcy code then in effect provided that "[a] governmental unit is deemed to have waived sovereign immunity with respect to any claim against such governmental unit that is property of the estate and that arose out of the same transaction or occurrence out of which such governmental unit's claim arose." 11 U.S.C. § 106(a) (1988), *later amended and recodified at* 11 U.S.C. § 106(b) (1994). We read the statute on appeal as a clear expression of Congress' purpose to require a waiver of immunity. 963 F.2d at 508–09. Since the basis for the state's administrative expense claim and the debtor's claim for a refund both arose out of the sale of the debtor's interest in the hotel, we reasoned that the state had waived its Eleventh Amendment immunity. *Id.* at 509.

What distinguishes the present case from *995 Fifth Avenue Associates* is that here no affirmative claim was made by the State of New York, the Department or the Retirement System. Thus, their involvement in the EEOC proceeding constitutes no waiver of sovereign immunity. Nor can plaintiffs prevail on their implicit argument that the fact of defendants' participation in the EEOC proceeding warrants a finding of waiver, even without the filing of independent claims. Not only do plaintiffs fail to cite any case—other than the three just distinguished in the foregoing paragraphs—but also we were unable to find any case resolving this issue in plain-

tiffs' favor. Rather, we recently affirmed a decision where the district court found no waiver of immunity when, prior to the lawsuit, the state consented to the EEOC taking over responsibility from the New York State Division of Human Rights for investigating the plaintiff's discrimination complaints. *See Jungels v. State Univ. Coll. of N.Y.*, 922 F.Supp. 779, 784 (W.D.N.Y.1996), *aff'd*, 112 F.3d 504 (2d Cir.1997) (table).

Moreover, the Supreme Court and this Court have repeatedly held that a state may assert Eleventh Amendment sovereign immunity at any time during the course of proceedings. *See, e.g., Calderon v. Ashmus,* 523 U.S. 740, 745 n. 2, 118 S.Ct. 1694, 140 L.Ed.2d 970 (1998) (the Eleventh Amendment is jurisdictional in that it limits a federal court's judicial power, and may be invoked at any stage of the proceedings); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99 n. 8, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (same); *Richardson v. N.Y. State Dep't of Corr. Serv.,* 180 F.3d 426, 449 (2d Cir.1999) (the defense of Eleventh Amendment immunity need not be raised in trial court to be considered on the merits); *Leonhard v. United States,* 633 F.2d 599, 618 n. 27 (2d Cir.1980) (sovereign immunity need not be expressly raised in the district court or on appeal since it is a jurisdictional defect and may be raised at any time). Consequently, while defendants appeared before the EEOC, and even though they never asserted sovereign immunity as a defense, they are entitled to raise it in response to plaintiffs' ADEA complaint.

This conclusion holds true regardless whether the EEOC proceeding is separate from or part of this federal lawsuit. If the EEOC investigation is distinct from the instant ADEA litigation, defendants' participation in the investigation would have no bearing on their right to raise sovereign

immunity as a defense to a federal court action. If the two are not distinct, defendants' ability to raise the defense at any time means that waiting did not constitute a waiver of their right to raise the defense later in their answer.

 It is urged, finally, that defendants waived immunity through their acceptance of federal funds. Because this argument was raised for the first time in plaintiffs' reply brief, we generally would not consider it. *Thomas v. Roach,* 165 F.3d 137, 146 (2d Cir.1999). But were we to reach the merits, this contention would also fail. Although Congress may, pursuant to its spending power, extract a constructive waiver of Eleventh Amendment immunity by placing conditions on the grant of funds to states, *see College Sav. Bank,* 527 U.S. at 686, 119 S.Ct. 2219 (citing *South Dakota v. Dole,* 483 U.S. 203, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987)), waiver based on participation in a federal program will be found only if stated in " 'express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction,' " *Fla. Dep't of Health & Rehabilitative Servs. v. Fla. Nursing Home Ass'n,* 450 U.S. 147, 150, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981) (per curiam) (alteration in original) (quoting *Edelman,* 415 U.S. at 673, 94 S.Ct. 1347). That is to say, mere participation by a state in a federal program providing financial assistance does not establish the state's consent to be sued in federal court. *Edelman,* 415 U.S. at 673, 94 S.Ct. 1347. Because plaintiffs failed to identify under what statutes defendants receive federal funding, or what Congress provided for in those statutes with respect to sovereign immunity, we have no way of ascertaining what Congress intended or whether the abrogation of immunity was expressed in "unmistakably clear language." *Welch v. Tex. Dep't*

*of Highways & Pub. Transp.,* 483 U.S. 468, 478, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987).

In sum, plaintiffs have not demonstrated that the "stringent" test for finding waiver of immunity has been met. Nor have we seen any of the required evidence that defendants made a "clear declaration" that they intended to submit to federal court jurisdiction. Hence, plaintiffs' waiver argument may not succeed.

## IV Whether the Retirement System Is an "Arm of the State"

 We pass now to the question of whether defendant Retirement System is an arm of the state entitled to assert sovereign immunity as a defense to this suit against it. The Eleventh Amendment extends immunity not only to a state, but also to entities considered "arms of the state." *Posr v. Court Officer Shield # 207,* 180 F.3d 409, 414 (2d Cir.1999); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) (asking whether the defendant board of education was an arm of the state, in which case sovereign immunity would be extended to it). Plaintiffs argue that the Retirement System falls outside this category.

 In determining whether an entity is an arm of a state, six factors are initially considered. *See Mancuso v. N.Y. State Thruway Auth.,* 86 F.3d 289, 293 (2d Cir.1996). Those factors, identified in *Feeney v. Port Authority Trans–Hudson Corp.,* 873 F.2d 628, 630–31 (2d Cir.1989), *aff'd on other grounds,* 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990), are derived from *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 401–02, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). They are: (1) how the entity is referred to in its documents of origin; (2) how the governing members of the entity are appointed; (3) how the entity is

funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's financial obligations are binding upon the state. *Mancuso,* 86 F.3d at 293. If these factors point in one direction, the inquiry is complete. If not, a court must ask whether a suit against the entity in federal court would threaten the integrity of the state and expose its treasury to risk. *Id.* If the answer is still in doubt, a concern for the state fisc will control. *Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 48–49, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994) (quoting *Feeney,* 873 F.2d at 631, with approval).

We examine the six factors.

### A. *How the Retirement System Is Referred to in State Statutes*

█ The Retirement System was formed under New York statute, now codified at Article 2 of N.Y. Retire. & Soc. Sec. Law §§ 2–119 (McKinney 1999 & Supp. 2001), and has the "powers and privileges of a corporation," *id.* § 10. In *Mancuso,* we noted that the phrase "public corporation" is of little help in determining whether an entity is an arm of the state, and looked to New York case law for clarification. *See* 86 F.3d at 294.

The New York Court of Appeals has stated that "the Retirement System is the kind of state instrumentality that is clothed with the sovereign immunity of the state." *Glassman v. Glassman,* 309 N.Y. 436, 440, 131 N.E.2d 721 (1956). Notwithstanding that the State Retirement System is a corporation, endowed with the powers and privileges that inhere to that kind of entity, *Glassman* said this fact had no effect on the agency's immunity. *See id.* at 441, 131 N.E.2d 721. Plaintiffs say this conclusion was *dicta* since the Retirement System was only an incidental party to the

real controversy between a husband and wife over the wife's entitlement as creditor to reach funds deposited by the husband in the System. *Id.* at 442, 131 N.E.2d 721. Even granting that, still, New York's highest court tells us how New York courts view the Retirement System, and because plaintiffs point to no contrary authority, this factor favors granting immunity to the System.

### B. *How Governing Members of the Retirement System Are Appointed*

Retirement System officers are designated by statute. The state comptroller serves as administrative head, N.Y. Retire. & Soc. Sec. Law § 11(a), as well as trustee, *id.* § 13(b). The state attorney general serves as legal advisor, *id.* § 14, and the System is subject to supervision by the state superintendent of insurance, *id.* § 15. The superintendent of insurance is in turn appointed by the governor with the advice and consent of the senate. N.Y. Ins. Law § 201 (McKinney 2000). The custody of the Retirement System's funds is vested in the head of the division of the treasury of the Department of Taxation and Finance. N.Y. Retire. & Soc. Sec. Law § 13(d). Given that the state legislature and the governor ratified the statutes by which these officers were designated, this factor too leans in favor of immunity. *See Glassman,* 309 N.Y. at 441, 131 N.E.2d 721 ("The close relationship between the Retirement System and the state government is apparent throughout the Civil Service Law provisions [from which the Retirement and Social Security Law was derived] which create and govern the affairs of the System.").

It makes no difference that the comptroller and the attorney general are elected officials because, regardless of that fact, the state has named them to positions of

authority in the Retirement System. *Cf.* *Mancuso,* 86 F.3d at 295 (holding that the appointment of Thruway Authority members by the governor with the advice and consent of the state senate leans toward immunity); *Feeney,* 873 F.2d at 631 (noting that the state appointment of commissioners to the Port Authority Trans Hudson Corporation favors immunity).

### C. *How the Retirement System Is Funded*

The Retirement System consists of four funds titled annuity savings, annuity reserve, pension accumulation, and pension reserve. N.Y. Retire. & Soc. Sec. Law § 20. Monies are provided by several sources. The state as an employer makes an annual appropriation, *id.* § 16(a), as do other participating employers, *id.* § 17. Employee members of the Retirement System also make contributions via payroll deductions. *Id.* § 21(b) & (d). An exception exists however, for state employees who became members prior to July 1, 1973, in which case no further contributions are required. *Id.* § 75–a(a). Their contributions are covered by the state in its annual appropriation. *Id.* § 75–a(b).

Ascertaining the particular funds where these contributions are deposited and from which benefits are paid is equally important. Payroll deductions from a Retirement System member, once remitted to the comptroller, are deposited in the annuity savings fund. *Id.* § 21(f). Upon retirement, contributions to that fund are transferred to the annuity reserve fund, from which all annuities and all benefits in lieu of annuities are paid. *Id.* § 22(a) & (b). An "annuity" is defined as "[t]he annual allowance for life, payable in monthly installments and derived from a member's accumulated contributions." *Id.* § 2(3).

The state and other employers make contributions to the pension accumulation fund. *Id.* §§ 16(a), 23(a)(1). Expenses incurred by the Retirement System are covered by monies contributed to this fund, in addition to monies appropriated in the state executive budget. *Id.* §§ 16(b), 23(b)(3). When a pension becomes payable, monies are transferred from the pension accumulation fund to the pension reserve fund. *Id.* § 24(b). Ordinary death benefits, however—such as those received by plaintiff James Nash—are payable wholly out of the pension accumulation fund. *Id.* §§ 24(a), 60(b).

Even with the payroll deductions of member employees, the state makes significant payments each year to the Retirement System for the payment of benefits and expenses. In particular, death benefits are payable out of a fund to which only the state and other participating employers presently contribute. These facts distinguish *Mancuso* where we ruled the state was not required to fund the Thruway Authority's operations since such funding was limited by law to a guarantee on the initial bond offering and to isolated instances of allocated funds for specific projects advocated by the state. *See* 86 F.3d at 295. Hence, the third factor also weighs in favor of immunity.

### D. *Whether the Function of the Retirement System Is Traditionally One of State or Local Government*

*Glassman* described the Retirement System as taking part in an important governmental function by "providing retirement pensions, annuities and other employment benefits for its personnel, comparable to those received by the employees of private industry." 309 N.Y. at 440–41, 131 N.E.2d 721. In so doing, it "assists and promotes the efficient operation of the affairs of the state itself." *Id.* at 441, 131 N.E.2d 721.

The fact that the Retirement System also facilitates pension benefits for municipal employees does not mean it is not serving state employees, since it was originally created as a plan for state employees. Only later was it extended to cover county, city, town and village employees. *McDermott v. Regan*, 82 N.Y.2d 354, 358, 604 N.Y.S.2d 890, 624 N.E.2d 985 (1993). Moreover, by way of analogy, we said in *Mancuso* that since the State Thruway covered the entire state, the Thruway Authority performed a function that a state would normally provide, even though the construction and operation of roads and bridges could be seen as either a state or local function. 86 F.3d at 295. Although the Retirement System does not service state employees exclusively, it assists in the business of the state by enabling the state to meet its pension and benefits obligations, and immunity should accordingly be extended to the Retirement System.

### E. *Whether the State Has Veto Power Over the Actions of the Retirement System*

The comptroller as the administrative head and trustee of the funds of the Retirement System is thereby authorized to "adopt and amend ... only such rules and regulations as he determines to be for the best interests of the retirement system." N.Y. Retire. & Soc. Sec. Law § 11(g).

There are certain legal restraints on the Retirement System. For example, funds are to be invested only in accordance with state law. *Id.* § 13(b). Without specifying exactly how funds may be invested, the statutory scheme includes percentage limits, and identifies permissible and impermissible investments. *See generally id.* § 13 (entitled "Management of funds"); *id.* §§ 176–179 a (entitled "Investments of Public Pension Funds"). Further, the System is subject to the supervision of the superintendent of insurance, *id.* § 15, who

may require the comptroller to file an annual report and to respond to inquiries related to transactions or to the condition of the Retirement System, N.Y. Ins. Law § 314(b)(1). The superintendent may promulgate "standards" with respect to a number of financial practices including "investment policies and financial soundness." *Id.* § 314(b)(2). He is required to conduct an examination into the affairs of the Retirement System at least once every five years and to incorporate his findings in a report made available for public inspection and filed with the governor, the comptroller and the legislature. *Id.* § 314(b)(3). While these provisions do not constitute a veto power, they subject the comptroller to strong oversight protections limiting his discretion.

At the same time, New York's Court of Appeals has held that the state legislature does not have unfettered power over the Retirement System. *Sgaglione v. Levitt*, 37 N.Y.2d 507, 375 N.Y.S.2d 79, 337 N.E.2d 592 (1975), struck down § 14 of the New York State Financial Emergency Act for the City of New York, which was enacted in 1975. *Sgaglione* ruled that this section of the law violated the state constitution because implicit in the constitution is protection for the source of funds for retirement benefits. *Id.* at 511–12, 375 N.Y.S.2d 79, 337 N.E.2d 592. Thus, although the legislature reserved to itself some flexibility in shaping the Retirement System, "it is not unlimited." *Id.* at 512, 375 N.Y.S.2d 79, 337 N.E.2d 592.

These concepts were reaffirmed in *McDermott v. Regan*, where the court stated that "[w]here the State maintains [some independent] authority in regard to the [comptroller], ... concomitant with that authority is the State's duty to act in a manner consistent with the goal of the 'protection' of [the Retirement System] funds as required by article V, § 7 of New York's Constitution." 82 N.Y.2d at 362,

604 N.Y.S.2d 890, 624 N.E.2d 985. Thus, any changes the legislature proposes for the Retirement System must be enacted for the purpose of protecting the interests of its beneficiaries.

As a consequence, while it does not appear from the above discussion that absolute veto power exists over decisions made by the comptroller in his capacity as administrator and trustee of the Retirement System, nonetheless the acts of the legislature, the oversight of the superintendent of insurance, and the contractual relationship created by New York's constitution restrain the comptroller from the exercise of unfettered discretion.

We think this case, contrary to plaintiffs' contentions, is unlike *Mancuso*. In that case we held the decisions of the Thruway Authority were essentially unreviewable. *See* 86 F.3d at 295. Moreover, our statement in *Mancuso* that "monies deposited with the Comptroller are not under the state's control," *id.*, is inapplicable to the pending appeal. In *Mancuso* we were refuting an argument that the Thruway Authority was subject to state control because it deposited all receipts with the comptroller and could issue bonds only with the comptroller's permission. *See id.* The "monies" referred to were monies belonging to the Thruway Authority-not all monies deposited with the comptroller. We also noted that the comptroller lacked discretion to refuse payment on the Thruway Authority's debts and had no duty to supervise the Authority. *See id.* at 295–96. The same clearly cannot be said with respect to the Retirement System. The fifth factor therefore tips toward immunity.

### F. *Whether the Obligations of the Retirement System Are Binding Upon the State*

The relevant question with respect to this sixth factor is "whether a judgment against the [Retirement System] would have the practical effect of requiring payments from New York." *Mancuso*, 86 F.3d at 296. In *Mancuso*, this factor worked against a finding of immunity because the Thruway Authority was self-sustaining and produced no evidence that it could not satisfy a judgment. *Id.* In contrast, the Retirement System is not self-sustaining as it requires contributions from employees, the state and other participating employers.

Further, employers utilizing the Retirement System—including the state—are obligated for interest charges that are payable, the creation and maintenance of reserves in the pension accumulation fund, the maintenance of annuity reserves and pension reserves, the payment of all pensions, annuities and benefits, plus the expenses of the System. N.Y. Retire. & Soc. Sec. Law § 18 (entitled "Guaranty"). Since the state constitution mandates that the benefits of the Retirement System not be diminished or impaired, the state will become responsible for replenishing monies used from the pension accumulation fund and the other reserve funds to pay a judgment increasing the amount of death and/or disability benefits owed. *Cf. Cabell v. New York*, No. 84 Civ. 1062, 1985 WL 2313, at *3 (S.D.N.Y. Aug.14, 1985) (finding judgment against Retirement System to compensate for discriminatory monthly retirement benefits amounts to judgment against the state, since state must cover annuity payments to non-contributory members and Retirement System must remain actuarially sound).

In finding the Retirement System was cloaked with sovereign immunity, the New York Court of Appeals applied similar reasoning. It said that as an employer the state is obligated to maintain the various

reserves and funds of the System, and is also obligated for the expenses and payment of employee benefits. *See Glassman*, 309 N.Y. at 441, 131 N.E.2d 721 (relying on the statutory predecessor to § 18 of the Retirement and Social Security Law).

This final factor provides the greatest weight in favor of immunity. *See Feeney*, 873 F.2d at 631 ("[W]hether liability will place the state treasury at risk, although not exclusively determinative, is the single most important factor."). As stated at the outset of our discussion, the Supreme Court has recognized that "the vulnerability of the State's purse [is] the most salient factor" when deciding whether sovereign immunity applies. *Hess*, 513 U.S. at 48, 115 S.Ct. 394. Indeed, we once remanded a case precisely for clarification as to what extent the state would be required to satisfy a judgment entered against the defendant, the City University of New York. *See Pikulin v. City Univ. of N.Y.*, 176 F.3d 598, 600–01 (2d Cir.1999) (per curiam).

Satisfied that we have properly resolved this factor, and being persuaded that all of the factors identified in *Feeney* and *Mancuso* point in the same direction, we conclude the Retirement System is cloaked with Eleventh Amendment immunity from plaintiffs' claims.

### V Plaintiffs' Request for Attorney's Fees

With each defendant successfully asserting sovereign immunity, the federal courts lack jurisdiction over this case. *See 995 Fifth Ave. Assocs.*, 963 F.2d at 506. Plaintiffs urge they should nevertheless be awarded attorney's fees as "prevailing parties" under the catalyst theory of recovery.

■■■ We have recognized that "a plaintiff who has obtained at least some part of what he sought in bringing the suit may be considered a prevailing party and

may therefore seek an award of attorney's fees." *Marbley v. Bane*, 57 F.3d 224, 234 (2d Cir.1995) (considering award under 42 U.S.C. § 1988); *accord Bonner v. Guccione*, 178 F.3d 581, 593–94 (2d Cir.1999) (42 U.S.C. § 2000e–5(k)); *McManus v. Gitano Group, Inc.*, 59 F.3d 382, 384 (2d Cir.1995) (29 U.S.C. § 1132(g)(1)); *Gerena–Valentin v. Koch*, 739 F.2d 755, 758–59 (2d Cir.1984) (42 U.S.C. § 1973*l*(e)). The plaintiff need not necessarily obtain a judgment or settlement in his favor, so long as "the defendant, under pressure of the lawsuit, alters his conduct (or threatened conduct) towards the plaintiff that was the basis for the suit." *Hewitt v. Helms*, 482 U.S. 755, 761, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987). A causal connection must exist between the lawsuit and the change in the defendant's conduct. *Koster v. Perales*, 903 F.2d 131, 135 (2d Cir.1990).

■■■ But when a federal court lacks jurisdiction, the case must be stricken from the docket. *The Mayor v. Cooper*, 73 U.S. (6 Wall.) 247, 250, 18 L.Ed. 851 (1868). It therefore follows that where we lack subject matter jurisdiction, we also lack jurisdiction to award attorney's fees. *W.G. v. Senatore*, 18 F.3d 60, 64 (2d Cir. 1994); *see also Farrar v. Hobby*, 506 U.S. 103, 109, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992) ("'[W]here a defendant has not been prevailed against, either because of legal immunity or on the merits, § 1988 does not authorize a fee award against that defendant.'") (quoting *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)).

The ADEA is enforced in accordance with the Fair Labor Standards Act (FLSA). 29 U.S.C. § 626(b). Under the FLSA, a court may award costs and attorney's fees "in addition to any judgment awarded to the plaintiff or plaintiffs." 29 U.S.C. § 216(b) (1994). Because in this

case no judgment may be awarded plaintiffs, no application for attorney's fees may be considered. *See W.G.,* 18 F.3d at 65 n. 2 ("Jurisdiction over the fee application in this case is nonexistent, because there is no jurisdiction over the substantive ... claims.").

An exception may lie where Eleventh Amendment immunity does not exist at the outset of the lawsuit, but arises as a direct result of actions taken by a defendant to provide some or all of the relief sought by the plaintiff. In *Marbley,* one of the claims at issue was whether the New York State Department of Social Services violated equal protection rights when it adopted a policy of reducing home heating assistance to tenants in federally-subsidized housing. *See* 57 F.3d at 228, 232. After the plaintiffs filed a motion for summary judgment, the department rescinded its policy, thereby precluding any prospective relief. *Id.* at 228, 235. As a result, the plaintiffs could seek only a retrospective declaration that the department had violated federal law. *Id.* at 232. But such relief was barred by the Eleventh Amendment.

In *Marbley* the district court denied attorney's fees for lack of jurisdiction. On appeal, we observed that while sovereign immunity did not exist when the suit began, the department's change in policy gave rise to the Eleventh Amendment defense that left plaintiffs without a claim. *Id.* at 235. We remanded for consideration of whether plaintiff's litigation triggered the policy change.

■ Although here the Eleventh Amendment bar did not exist at the outset—in fact plaintiffs were originally successful—the reason it is now a complete defense has no connection to any action taken by the defendants, including the decision to correct the ADEA violations with supplemental death benefits payments. Rather, it is solely the Supreme Court's decision in *Kimel* that mandates the Eleventh Amendment dismissal of plaintiffs' suit.

Since plaintiffs' lawsuit was not a catalyst for corrective action that resulted in the loss of subject matter jurisdiction, no attorney's fees may be awarded. In light of this conclusion, we need not reach defendants' contention that attorneys' fees cannot be awarded under the ADEA based upon the language in the FLSA permitting such an award only in connection with a judgment entered for plaintiffs. *See* 29 U.S.C. § 216(b).

## CONCLUSION

Despite defendants' admitted violations of the ADEA, we are constrained to agree with the district court that it lacked subject matter jurisdiction over plaintiffs' claims because the Eleventh Amendment cloaks all defendants with sovereign immunity.

Accordingly, the judgment appealed from is affirmed. No costs to either party.